**NATIONAL LABOR RELATIONS BOARD v. LELAND–GIFFORD CO.**

No. 4654.

United States Court of Appeals
First Circuit.
Dec. 22, 1952.

Maurice Alexandre, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associated Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Marcel Mallet-Prevost, all of Washington, D. C., on brief), for petitioner.

Ernest L. Anderson, Worcester, Mass., for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The principal issue presented by this petition for enforcement of an order of the National Labor Relations Board is whether thirteen individuals were employed by the Respondent as supervisors as defined in § 2(11) of the National Labor Relations Act. 49 Stat. 449 (1935) as amended by the Labor Management Relations Act, 1947, 61 Stat. 138, 29 U.S.C.A. § 152(11), during the period of time covered by a complaint alleging an unfair labor practice on the part of the Respondent in refusing to bargain with the duly certified bargaining representative of its production and maintenance employees except, *inter alia,* those having supervisory status.[1]

The question arises on the following evidentiary facts as to which there is little if any dispute.

The Respondent has been engaged for many years in the business of manufacturing machine tools, its primary business being the manufacture of "sensitive" drilling machines. It does not manufacture any stock models, but builds specially designed drilling machinery on individual orders from its customers. Thus it manufactures a great variety of machines, some small and others large, many weighing several

---

1. The facts essential to the respective jurisdictions of the Board and of this Court were stipulated at the hearing before the Trial Examiner.

tons. The Trial Examiner found that because of the peculiar nature of its product, the Respondent's business "is always in a state of flux, one month up and the next month down, all depending upon the receipt of orders."

In order to accommodate itself to the more or less unpredictable fluctuations in its business, the Respondent has for a great many years organized its plant on the basis of numerous small, pretty much self-sufficient, but nevertheless interdependent departments, each in charge of an experienced man, who is carried on the payroll as a "foreman," or "assistant foreman." During the war years, when the Respondent was employing some 500 men in its machine tool plant, it had 62 departments, and the Board found that the person in charge of each one of them was in fact a "supervisor." After the war the Respondent's business decreased, and at various times from 1945 to 1949 its production and maintenance force was reduced until in the latter year it reached a low point of 100 to 125 men, and the number of departments in the plant shrank to between 25 and 30. At the time of the hearing herein, however, its force in the unit involved had increased to about 300 men.

As a result of the post-war reduction in force and the elimination of departments, some former department heads were transferred to routine production work in another department. Of the departments which remained in the Respondent's plant some were reduced to one man, and that the former supervisor, who by working as an ordinary production man was able to do all the work of his department. Other departments were reduced to the former supervisor and one to a few underlings, and in those cases the former full-time supervisor divided his time as necessary between working as a production man himself and supervising the man or men remaining under his direction and control. Nevertheless, in spite of the nature of the work being done by the admittedly former supervisors during the period of maximum reduction in force, the Respondent kept those men on under their old titles and, apparently, at their old rates of pay. The question here is as to the status of thirteen [2] of these men who remained in their old departments during the time covered by the complaint and who during that time had in some instances none and in other instances only a few men under them.

The question is presented in this way. In 1943, as the result of a secret Board election, United Steel Workers of America, CIO, was certified by the Board as the bargaining representative of all the production and maintenance employees in the Respondent's plant except, among others, "supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees, or effectively recommend such action." The Board agent in charge of that election excluded all persons classified by the Respondent as "foremen" and "assistant foremen" from the list of eligible voters, and neither the Union nor the Respondent objected. Thus it would seem, although neither the Trial Examiner nor the Board made a categorical finding on the point, that none of the thirteen men here involved voted at that election, for at that time all of them were carried on the Respondent's rolls as either "foremen" or "assistant foremen," some having held their titles for over thirty years.

Following certification, the Union and the Respondent entered into a series of contracts. And at the conferences preceding each contract the Union requested information concerning individual rates of pay, job classifications, and rate ranges. Later, after the post-war reduction in the Respondent's labor force, the Union also asked the Respondent to "clarify the bargaining unit," asserting that the Union ought to be recognized as the representative of those "foremen" and "assistant foremen" who were then regularly engaged in production work in departments which contained no individuals which the Respondent classified as "employees." The

---

2. Really we are concerned with only eleven of them for we were told at the oral argument that since the hearing one had died and another had resigned.

Respondent offered the Union a list of job classifications and rate ranges, but it refused to disclose individual rates of pay or the names of employees in the various job classifications on the ground, primarily, that such matters were of a personal and confidential nature and dissension in its plant would result if the Respondent disclosed that information. The Respondent said that it could not bargain with respect to the make-up of the bargaining unit because that unit had been fixed by the Board at the time of the election and only the Board could change it.

Nevertheless, in spite of the Respondent's refusal to bargain with respect to the above matters, annual contracts were signed by the Respondent and the Union in 1944, 1945, 1946, and 1947, and a two-year contract was signed in 1948. In the summer of 1950, during negotiations for another contract, the matters at issue over the years between the Respondent and the Union came to a head when the Union in August filed a charge against the Respondent alleging the latter's refusal to bargain collectively with the Union "concerning certain employees within the bargaining unit." However, notwithstanding the Union's charge, another annual contract was signed in September 1950, and, discussions of the disputed issues continuing, the Union filed an amended charge in November, adding to its former one the charge that since on or about May 16, 1950, the Respondent had refused to bargain with the Union in that it had refused to furnish the Union with "payroll data concerning employees within the bargaining unit." The General Counsel on behalf of the Board issued a complaint on these charges alleging that "On or about May 16, 1950, and at all times thereafter, Respondent did refuse and continues to refuse to bargain collectively with the Union as the exclusive representative" of the employees in the unit in violation of § 8(a)(1) and (5) of the Act, 29 U.S.C.A. § 158(a) (1, 5). Typical administrative procedures followed resulting in due course in the order of the Board couched in the usual remedial terms directing the Respondent to bargain collectively with the Union by disclosing the individual wage rates of employees in the Unit in which it included the thirteen men with whom we are concerned. This is the order we are asked to enforce in the present proceeding.

The Trial Examiner saw the question of the Respondent's duty to give the Union data as to the individual wages of its employees in the unit as separate and distinct from the question of the Respondent's duty to bargain with the Union as to the composition of the unit. And he resolved both questions against the Respondent. The Board, however, took a different approach but reached the same conclusion. Believing that by "segregating the questions" the Trial Examiner "may have broadened the issues" beyond those presented by the record, it said:

"We see no occasion for deciding here whether the 'job status' of the 'foremen' or 'assistant foremen' was a matter on which the Respondent was obliged to bargain with the Union. It seems clear from the facts set forth above that the real dispute in this case did not arise from any efforts by the Union to bargain in any general fashion as to the 'job status' of these individuals. It sought information as to the individual wage rates of all employees including those of the 'foremen' and 'assistant foremen' who were regularly engaged in production work in departments which contained no employees for them to supervise. It was denied such information on the general ground that the Respondent was not obligated to disclose such information, and, as to the 'foremen' and 'assistant foremen' in question, on the added ground that such individuals were supervisors and thus outside the bargaining unit. The issues posed therefore are: (1) whether the Respondent was under an obligation to furnish the Union with a list of individual wage rates, and (2) if it was, whether the 'foremen' and 'assistant foremen' in question were 'employees' so that the obligation to disclose the individual wage rates included them."

■ The first issue posed by the Board does not require extended consideration. The Board found that information as to the wages paid to individual "employees" in the unit was "relevant" on the issue of wage inequities as well as with respect to the "policing of the administration of any contract," and those findings are not disputed. Indeed, the Respondent now, tacitly at least, seems to concede, as we think it must, that under the authorities it is required to give the Union data as to the wages paid to the individual "employees" in the unit. Aluminum Ore Co. v. N. L. R. B., 7 Cir., 1942, 131 F.2d 485, 487, 147 A.L.R. 1; N. L. R. B. v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947, 949. See also N. L. R. B. v. J. H. Allison & Co., C.A.6, 165 F.2d 766, 3 A.L.R. 2d 990, certiorari denied, 1948, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369; N. L. R. B. v. Jacobs Mfg. Co., 2 Cir., 1952, 196 F.2d 680.

The Board's order requiring disclosure of the wages paid to individual "employees" in the unit will be enforced.

The second issue whether the thirteen men here involved should be included among the "employees" in the bargaining unit requires more extended consideration. Counsel for both the Respondent and the Board have treated this issue as though it were whether or not the individuals concerned had ever been clothed with any one or more of the supervisory powers enumerated in § 2(11) of the Act quoted in the margin.[3] The issue as we see it, however, is narrower than this, for the Trial Examiner found that some, and the Board, as already indicated, found that all, of the thirteen men involved had clearly enjoyed supervisory status during the war years and perhaps before. Both concluded, however, that they had lost their status during the post-war reduction in the Respondent's force. The Board said:

"The 'foremen' and 'assistant foremen' whose status is at issue here undoubtedly possessed supervisory authority in the past, and it may well be that at some uncertain future time they may be assigned to duties which afford an opportunity to exercise such authority again. But it is clear that such was not the case during the period covered by the complaint herein, and, so far as the record before us shows, is not the case now."

Thus the question is not the overall status of the men with whom we are concerned; it is their status at the particular time covered by the complaint, i. e., "May 16, 1950, and at all times thereafter."

The Board rested its conclusion of non-supervisory status during the above period on the proposition that during that time "no supervisory powers *existed* in the individuals involved, for not only were the alleged powers not exercised, but they *could not* be exercised . . . either because they [the individuals] had no employees working under them as to whom such powers might be exercised or because they were assigned to departments in which no part of their duties then performed *contemplated* the exercise of supervisory powers." And the Board added: "It seems clear to us that an individual cannot be deemed to possess the powers of a supervisor so long as his job is such that there can be no opportunity to exercise such powers."

Although we have not been able to find any judicial authority in point, or indeed any that is particularly helpful, we feel constrained to quarrel with the Board's statement of the rule on which it rested its conclusion, at least with the broad sweep of its language. Furthermore we think the facts so far as the Board has found them do not warrant application of the rule as we think it to be limited.

3. "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The statute cited in footnote 3, supra, does not make exercise of any one or more of the powers enumerated therein the test of supervisory status. It makes the existence of one or more of the powers the test. As the court said in Ohio Power Co. v. N. L. R. B., 6 Cir., 176 F.2d 385, at page 388, 11 A.L.R.2d 243, certiorari denied, 1949, 338 U. S. 899, 70 S.Ct. 249, 94 L.Ed. 553: "Section 2(11) covers any individual 'having authority * * * responsibly to direct * * *.' It does not require the exercise of the power described for all or any definite part of the employee's time. It is the existence of the power which determines the classification." We do not take this statement to mean that mere existence in theory only of a power described in the statute is enough to make a "supervisor." Certainly it cannot be that an employer can make a "supervisor" out of a rank and file employee simply by giving such an individual a title and theoretical power to perform some one or more of the supervisory functions listed in § 2 (11). Nor can an employer make a "supervisor" out of a rank and file employee by the grant of power to exercise a supervisory function only spasmodically and infrequently. N. L. R. B. v. Quincy Steel Casting Co., Inc., 200 F.2d 293. On the other hand, we think the statute does mean that once an individual has actually been clothed with genuine power to perform a supervisory function, he thereupon becomes a "supervisor," even before an opportunity arises to exercise his power, and even though he may not often find it necessary to exert the power conferred. That is to say, one clothed with real power to discipline other employees, for instance, would be *ipso facto* a "supervisor," even though in a particular instance months, or perhaps in rare cases even years, might pass before any occasion ever arose calling for an exercise of the power. And we think the same principle must apply with respect to the other powers enumerated in the section, including the power "responsibly to direct" other employees. Consequently we do not think that a mere temporary hiatus in opportunity to exercise the latter power

caused, for instance, by a temporary shut down due to retooling, a seasonal fluctuation in volume of business, vacations en masse, a mechanical casualty in the plant, or some like cause, during which a "supervisor" stayed on alone to do production work, would cause the "supervisor" to lose his status in the interval. We agree, however, that not only an actual demotion in rank, but also a reversion to routine production work for such an extended and wholly indefinite period of time that the erstwhile supervisor could reasonably be said to have become a rank and file production worker for all practical purposes, would work a loss of supervisory status even though both title and theoretical power remained and might perhaps with an expansion in force be resumed at some vague time far in the future.

In view of the foregoing we think the Board stated the rule governing loss of supervisory status through loss of employees to supervise too broadly. Moreover, we think the Board, if it did not actually err, was at least unclear in its findings of the facts to which it applied the rule.

The Board rested its application of the rule discussed above on the finding that during the critical period the men involved either had no employees working under them over whom they could exercise their supervisory powers, or else were assigned to a department where exercise by them of supervisory power was not contemplated.

It is true that some of the men involved for part, and in some instances for all, of the time involved, indeed a few for a matter of years, worked alone in their departments. But if the second reason given by the Board for applying the rule is that the rest of the men involved were transferred to routine production work in some other department, as seems reasonable in view of a prior statement in the Board's decision that as a result of the reduction in the Respondent's force "some of the 'foremen' and 'assistant foremen' were shifted to other departments where they were employed in production work," the reason assigned is wrong. For it appears from the

evidence and the findings of the Trial Examiner that none of the men here involved were transferred to any other department, but that all remained in the departments in which they had worked for years. On the other hand, if the finding means that the men, other than those who had no men under them, found themselves assigned to a department in which so few men remained that exercise of supervisory authority over these men was not contemplated, it is also wrong. The evidence is that those who retained other men in their respective departments were expected to and did supervise those men, even though supervision did not take much of their time, with the result that most of their time was spent in routine production work. And it appears from the evidence and the Trial Examiner's findings that during some part or all of the time involved at least three of these men retained one or more men under their supervision, control and direction. Furthermore, we know from the findings that at the time of the hearing in February 1951, the Respondent's production force was back to three-fifths of its full wartime strength, and we also know from undisputed testimony that at that time one of the thirteen men involved had seven men under him, so that his department, at least, was back to about the average size of the Respondent's departments during its peak war time production period.

 The findings of the Board as to the above crucial facts seem to us so lacking in clarity, if not actually wrong, that we think it appropriate to exercise our power to enforce the Board's order in part only, and to remand the case to the Board for further proceedings as to the rest of the order. See N. L. R. B. v. Somerset Shoe Co., 1 Cir., 1940, 111 F.2d 681, 690. By this procedure the Board, if it sees fit, may clarify and correct its findings, taking additional testimony if so advised, and it may also find whether it can be said that because of the length and indefiniteness of the time of the Respondent's reduction in force, some or all of the men involved have reverted for all practical intents and purposes to being regular routine production or maintenance workers. And following this the Board can apply the rule as to loss of supervisory status to the factual situation found to exist at the time of the new hearing, for it would not be appropriate to require disclosure of the present wage data of men who had actually resumed supervisory status, regardless of what their status might have been at some particular period in the past. Then, if the Board should see fit to conduct further proceedings, and issue a new order as to the current status of the men involved, those additional proceedings and the new order will be made a supplemental part of the pending record for our final action and decree.

The Respondent's further contention that because of the Respondent's refusal over the years since 1944 to disclose the individual wage rates of employees the complaint herein should be dismissed because the charge on which it rests was not filed within six months of the occurrence of the unfair labor practice alleged is covered to our satisfaction in the Trial Examiner's Intermediate Report and the decision of the Board. The Respondent's other contentions have been considered, but none of them seems to us of sufficient merit to warrant discussion.

A decree will be entered enforcing the order of the Board, including disclosure to the Union of the individual wage data of employees in the unit, but not requiring such disclosure with respect to the men whose supervisory status remains for determination, and remanding the case to the Board for further proceedings not inconsistent with this opinion with respect to the inclusion in the unit of the men here involved.