NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HUNTER ENGINEERING COMPANY,
Respondent.

No. 14881.

United States Court of Appeals
Eighth Circuit.

Sept. 29, 1954.

Norton J. Come, Atty., N. L. R. B.,
Washington, D. C. (George J. Bott, Gen.

Counsel; David P. Findling, Associate Gen. Counsel; A. Norman Somers, Asst. Gen. Counsel; and Ruth V. Reel, Atty., N. L. R. B., Washington, D. C., were with him on the brief), for petitioner.

Glenn L. Moller, St. Louis, Mo. (Moller & Talent, St. Louis, Mo., were with him on the brief), for respondent.

Before GARDNER, Chief Judge, and STONE and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order determining violations of the Act by the Hunter Engineering Company.

The violations of the Act found by the Board were (1) of § 8(a)(1), by interfering with, restraining, and coercing its employees in their rights, under § 7 to organize a bargaining unit; (2) of § 8 (a)(3), by discriminatorily laying off eight employees to thwart such organization; and (3) of § 8(a)(5), by refusing to bargain collectively with a Union representing a majority of its employees. 29 U.S.C.A. §§ 157, 158(a)(1, 3, 5). Besides contending that certain evidence was improperly admitted,[1] the Company challenges each essential finding of the Board.

Before examining each of these three issues in detail, it will be helpful to state broadly the entire situation into which they fit. In July, 1952, Mr. Damon, a union organizer for the International Association of Machinists, began a movement to organize the production and maintenance employees at the Respondent's plant. He enlisted the interest and help of several employees; and, on Sunday, August 10, he discussed with employee Chapman (who had been a member of the same labor organization under a prior employer) getting the employees to sign up. A week later, August 17, he arranged with Chapman to circulate information that a meeting would be held the next afternoon, after work hours, at a tavern about two and one-half blocks from the plant. At this meeting, Mr. Damon explained that it was for the purpose of organizing; and that the method of doing so was by the signing of authorization cards, which were circulated. Signed cards were delivered to Damon at the meeting. Later, other signed cards were received by Damon, three coming by mail. A few days after the meeting, three of the discharged employees came to the Union headquarters (3547 Olive Street, in St. Louis) and conferred with Damon and Redman. As a result, these two and these employees got up a hand bill which was distributed by these employees to the other employees of Respondent. At a meeting of the employees on August 25, Redman and Damon ascertained approximately the total number of employees and then determined that a majority had signed up. So believing, Mr. Damon (accompanied by James Redman, District Organizer for the Union) called on Mr. Lee Hunter, Jr., President and General Manager of Respondent, at his office on August 26. They informed him that they represented the Union which had been organized for bargaining purposes. They said they had a majority of the affected employees. He inquired whether they had included therein men who had been laid off on August 18 and 19. They replied they had included such. At that meeting, Mr. Hunter manifested a willingness to discuss the matter at their convenience. Mr. Damon said he would have to be absent until into September at a Union Convention. Also, that they did not draw up the contract desired by the men

---

1. Two issues regarding admission of evidence will be considered in connection with the main issues with which they are connected. One of these, having to do with a statement by witness Redman and relating to the issues of "(1) Interference, Restraint and Coercion" and "(2) Discriminatory Lay-Offs", will be discussed at the close of the latter issue. The other issue as to admission of evidence is the admission of membership applications. This will not be separately discussed but is covered by what will be stated in connection with the issue "(3) Refusal to Bargain" etc.

but simply presented any contract which the employees might evolve at a meeting of Union members yet to be held.

The next day, (August 27), Mr. Damon wrote to Mr. Hunter as shown in the footnote,[2] enclosing therewith copies of the "Union Notices" as stated in the letter.[3] This letter, with enclosures, was received August 28. Respondent did not acknowledge receipt of the letter and did not post the notices.

It is in the above outlined situation, that the issues here are found. These issues are (1) interference, restraint and coercion of its employees in formation of the local union; (2) discriminatory lay-offs of employees; and (3) unlawful refusal to bargain with a union of employees.

In examining these issues, we bear in mind two rules which are as follows.

"The burden of proving the charges of unfair labor practices charged in the complaint was upon the Board." Local No. 3, United Packinghouse Workers of America, CIO v. National Labor Relations Board, 8 Cir., 210 F.2d 325, 328–329. The evidence must be considered as a whole to determine whether a finding of the Board is supported by substantial evidence. N. L. R. B. v. Injection Molding Co., 8 Cir., 211 F.2d 59, 62.

(1) *Interference, restraint and coercion of employees.* The Board sustained findings of the Trial Examiner that Respondent had violated § 8(a)(1) of the Act by two actions. One of these was the surveillance or spying upon the meeting at the tavern on August 18 by Joseph Hunter (Secretary, Treasurer and personnel and advertising manager), William Lucas (production superintendent) and Ed Goergen (a supervisory employee). These three persons sat in an automobile near the entrance to the tavern for some fifteen minutes while the employees were meeting inside.

The other incident was a statement by George Worthington (operating vice-

---

2. "Registered Letter
"Return Receipt Requested
                      August 27, 1952
"Mr. Lee Hunter, Pres.
"Hunter Engineering Co.
"8844 Ladue Road
"St. Louis County, Mo.
"Dear Sir:
    "This is in regard to the meeting that Mr. Redman and I had with you at your office August 26th, 1952 whereby you granted District No. 9, I. A. of M. recognition and agreed to bargain with us as representatives of your employees for wages, conditions, etc.
    "After looking over my appointment book I find I have Tuesday, September 23rd open either 10:00 A. M. or 2:00 P. M. for this purpose. I would like an early reply so that I can arrange my schedule after returning from our convention.
    "Enclosed are two copies of Union Notices which I wish you would post on the Bulletin Board for your employees.
    "With best wishes, I remain,
      "Yours very truly,
        "DISTRICT NO. 9, INTERNATIONAL
        "ASSOCIATION OF MACHINISTS,
        "CHARLES DAMON,
              Organizer."

3.                  "Union Notice.

    "Seal of
    "International
    "Association
    "of Machinists

        "Notice      Notice      Notice

              "Please Post

    "To all Employees of the Production and Maintenance
      "Departments of Hunter Engineering Company:

    "Greetings—There will be a meeting at the
              "Machinists' Building
              "3547 Olive Street
              "St. Louis, Missouri
      "on Wednesday, September 3, 1952
              "at 8:00 P. M.
              "in Hall No. 404

    "This meeting is for the purpose of drawing up proposals for an agreement to be submitted to your Employer.

              "Fraternally yours,
                "KENNETH WHITSON,
    "Asst. Bus. Rep. Dist. #9, I. A. of M.""

president), about two weeks after this meeting, regarding employee Cella. Cella was one of the three men laid off on August 19, without notice. Cella had been asked to and had worked overtime the night of August 18. An employee, Roy Wilkinson, was told by Worthington that Lucas had seen Cella at the tavern where the meeting was being held on August 18. When Wilkinson asked what Cella was doing, Worthington said he was waiting to get back his job but that he "was going to have a hell of a long wait." Cella was a good workman.

There is no dispute that an automobile driven by Hunter, was parked near the tavern at the time the employees were about to have their meeting the afternoon of August 18th. Lucas and Goergen also were in the car. It was parked where the occupants could have observed those entering the tavern. Hunter testified that he had stopped to get something from a drug store. Three employees who had observed the car from the tavern window and were suspicious, came out and saw the three men sitting in the car. The employees crossed the street to the car of one of them and drove a short distance, returning by the parked car, which drove away shortly after they returned to the tavern. They saw no one enter or leave the parked car. Lucas gave no testimony as to this matter and Goergen was not a witness.

■ We believe this charge of surveillance is established. Also, considering the entire evidence, we think the evidence as to the statement attributed to Worthington—although denied—should be accepted as true.

Closely connected with this issue of "interference", etc., is the lay-off of eight employees, which will be treated next herein.

(2) *Discriminatory Lay-Offs.* This issue involves eight men.[4] Kenneth Bagley had left Respondent on August 23 because of differences of opinion with the management over matters having no connection with this labor situation. He had been with the Respondent about five years and was shop foreman over production at the time he resigned. Early on August 18, he consulted with Worthington and Lucas and it was decided to put the men on a nine-hour day "to catch up on a backlog of orders we had." About 9:30 on the morning of August 18, he informed the shop employees that they would work a nine-hour day until further notice. About 3:00 o'clock that afternoon, Mr. Joe Hunter came to Bagley's office and told him that he would get a list of men to be laid off that afternoon. In that conversation, Lucas stated that "he was dissatisfied with the way the situation was handled and that he would much rather have the men brought in collectively and hear their grievances and see that it could be settled in a friendly manner." Also, he stated, in substance, "That there was a possible union organization being started in the shop and these men were being laid off to circumvent this action." About thirty or forty-five minutes later, Hunter gave him a list of five men to come separately to Hunter's office. This he did. Early the next morning, the same thing occurred as to four other men. He had no prior notice of any men to be laid off until Lucas so informed him.

Respondent's position is that, at the time of the lay-offs, "there had been no union activity of which Respondent could have been aware." There was substantial evidence that Respondent had such information and that the lay-offs were connected with the movement to form the union. Five of these men were laid

4. In a footnote to its Report, The Board states:

"4 The Trial Examiner also found that George Wallweber [a ninth man] was laid off discriminatorily. As this employee was not included in the complaint and as his layoff was not litigated, we shall not adopt the Trial Examiner's findings with respect to George Wallweber."

At the time of the hearing before the Examiner, Wallweber was in the Army and not present. His signature on a membership card was identified by his mother.

off after 3:30 P.M. of August 18 shortly before the meeting of the employees at the tavern to organize the union, which occurred right after work about 5:30 that afternoon. That morning, the men had been put on a nine-hour day to catch up with a backlog of orders. Notice of this change had been given by the shop foreman, who knew nothing of any contemplated lay-offs until about three o'clock when he was notified that he would be given a list of men to be laid off. Three company officials sat, for a short while, in an automobile parked near the entrance to the tavern during the time the men were meeting there. Four men were laid off early the next morning. All of these nine men were signed members to organize and, excepting Wallweber, were active in organizing. Seniority was not observed in selecting men to be laid off.

All of these men were good workmen against whom no complaints as to work were made and several of them were key men in the shop. At this time there was a surplus of work. From September 9 to 16, Respondent advertised for "Factory workers—General factory workers—punch press operators with some set up experience—Shipping helpers. Day shift."

■ On the whole record, we think the action of the Board is supported by substantial evidence as to these two issues of Interference and of Discriminatory Layoff of these eight men—really nine, if Wallweber is included.

■ In connection with these issues of interference and coercion, Respondent argues that prejudicial hearsay evidence was admitted. This was a statement by Redman, at the August 25 meeting of employees, "we were informed by the people that the company had held a meeting with the people that day, captive meeting and they were informed at this meeting that before they would have a union in there, the plant would have to close." On objection and motion to strike, the Examiner ruled: "Unless it is connected up with some later action, I will permit it, subject to that." At the close of the direct examination of this witness, the motion to strike was renewed and denied. No other witness testified as to this matter. No reference whatever is made to this incident in the Report of the Examiner nor in the Decision of the Board. A complete examination of the entire record convinces us the Examiner and the Board fairly and objectively performed their duties. No prejudice is shown in this admission of evidence—whether the admission was conditional or positive.

(3) *Refusal to bargain collectively with a union representing a majority of its employees.* There is no dispute that Union representatives called on Mr. Lee Hunter, Jr., President and General Manager of Respondent, on August 26, requesting recognition of the Union and stating that they represented a majority of the production and maintenance employees at the plant. In answer to a question by Hunter, they stated that this majority included the men who had been laid off. Hunter made no further inquiry nor any request for showing of authorization cards for membership. There is a divergence in the testimony as to whether Hunter then expressed an unqualified willingness to recognize and bargain with the Union. On the following day, the letter set forth in footnote 2 was sent. At any rate, Respondent did not bargain and this proceeding before the Board resulted.

From this situation, arises the issue here as to whether the Union had a majority of the production and maintenance employees as members on August 26 when recognition was demanded. Membership is evidenced by so-called "authorization cards", signed by the employee, which authorize his enrollment or inclusion as a member of the Union. The statute authorizes a majority of the employees (in a given line of employment) to constitute a bargaining unit. Hence the issue here is whether the Union had, on that date, such cards from a majority of the production and maintenance employees.

The broad reason for not bargaining, relied upon by Respondent, is that the Union did not represent a majority of the production and maintenance employees on August 26, when the demand for recognition was made. On that date, Respondent's payroll was 63 employees, if the ten discharged men are included. The parties agree that two names should not be counted for reasons not here material. If the discharged men are counted, 32 would be a majority. If these ten men are not to be counted, 26 would be a majority of the 51 remaining. The Union offered 35 signed authorization cards which included the two above eliminated names.

Two main issues [5] are presented by Respondent.

The first issue is that the men discharged on August 18 and 19 cannot be properly counted in determining Union membership on August 26 when recognition was demanded. This position is not sound. All of these men were discharged discriminatorily because of the Union organizational movement which resulted in the recognition demand only about a week later than the discharges. If an employer could discharge men who are trying to organize a union because of such endeavors, he might succeed in preventing organization. It is not possible that an employer by violating the Act, which prohibits such discharges, can defeat the underlying basic purpose of the Act, which expressly sanctions labor organizations. These discharged men are to be counted in determining whether a majority of the employees were, on August 26, organized as a bargaining unit.

The second contention of Respondent is that, even including these discharged men, the Union has failed to prove that there was such a majority on that date. The essence of this contention is the claimed failure to show, by competent evidence, that all of the individual membership application cards were signed by the employees as they purported to be.

Of these 33 cards presented by the Union, the Board eliminated one (Wallweber) because it found he was not discharged discriminatorily. Thus, 32 cards were left—a bare majority of one—all of which the Board counted to make the necessary majority.

The evidence abundantly establishes the authenticity of 21 of these cards beyond dispute. The disputed issue here is as to the authenticity of the other 11 cards. The evidence as to them is as follows. All of the 35 cards, including these eleven, had come into possession of Damon as follows. Seventeen were handed in to Damon during the meeting on August 18. Some of these were handed to him by the employees and some were collected by Redman and handed to Damon during the meeting. Damon recalled many of the names of the employees handing him the cards. Redman recalled only that he had collected various cards at the meeting and then handed them to Damon. Other cards were collected on the next day (August 19) by Albert Scheffing and delivered by him to Damon. Scheffing could not identify these cards but testified to collection and delivery. Damon testified to receiving 14 cards from Scheffing on August 19. Before August 26, Damon received 3 cards by mail at Union headquarters. On August 25, an employee (Arthur Schillinger) signed a card while at the meeting held on that date.

5. The Union contends that President Hunter agreed, on August 26, to recognize and to bargain with it at its convenience; and that subsequent increase of wages and refusal to bargain support a finding of refusal to bargain. Obviously, the crucial link in this chain is the alleged consent to bargain on August 26. A painstaking study of all the evidence bearing upon this matter convinces us that Hunter carefully avoided a direct commitment as to recognition but expressed a willingness to meet further with the Union representatives at their convenience. He had had no notice of this meeting on August 26 and seems to have wished to maintain a noncommital attitude for the time being. In so doing he was within his rights in the situation in which he was placed at that time.

Of these 35 cards, three are those hereinbefore noted as eliminated. All others were separately identified personally or by identified signatures except eight of those claimed to have been executed at the August 18 meeting and the three received by mail. These eleven are the ones where identification is challenged by Respondent. This challenge is not based on any dispute in the evidence but solely upon a lack of sufficient evidence.

Damon read a list (from the application cards offered as exhibits) of cards which he testified were handed to him personally by employees at the August 26 meeting. Apparently, this included all of the group of eight challenged by Respondent. It was conceded that Respondent's payroll contained the same names shown on all of the various cards —although there was no concession as to signatures. There was no testimony as to the three mailed cards other than that they came by mail to Damon and that corresponding names were on the payroll.

In connection with the offer of all of the application cards, the following situation was created by objections and rulings thereon.

"Q. Isn't it a fact, Mr. Damon, that the General Counsel's Exhibits for identification 3–A through 3–R, were cards allegedly signed at the meeting, handed in to either you or Mr. Redman?

"A. There were some handed to me and some were handed to Redman, but I remember the names very well on some of those cards.

"Q. Can you tell us some names that were handed to you?

"Mr. Trent: I object to that, he has gone over that.

"Trial Examiner Whittemore: I am not going to prolong the hearing to test the witness' memory. He has gone through the cards under oath and said they were turned over to him by the individuals.

"Mr. Talent: I have no further questions at this time, subject to a later objection and chance to check them.

"Trial Examiner Whittemore: All right. And subject to later check, if you wish, for the signatures.

"Mr. Talent: I am objecting to the admission of these cards, Mr. Examiner.

"Trial Examiner Whittemore: The objection is overruled, they are received. Those that are marked General Counsel's Exhibit 3, with the exception of F, I, L and I think it is Q. That is, those that this witness testified were received by him from the parties, whose signatures appear on there, that is a matter that if you wish to raise a question as to the accuracy of that, of the signature, that is a matter for you to take care of later. I will reconsider by receiving them in evidence if it appears later that the signatures don't agree. As it is now, this witness is testifying that they were turned over to him.

"(The documents heretofore marked General Counsel's Exhibits 3–A, 3–B, 3–C, 3–D, 3–E, 3–G, 3–H, 3–J, 3–K, 3–M, 3–N, 3–O, 3–P for identification were received in evidence.)

"Mr. Talent: Just to clarify the record and my position on the record, I understand that I have objected to the admission, that the cards have been allowed or admitted on the testimony of this witness, subject to my later comparing them with the signatures on the company records, if we have the signatures.

"Trial Examiner Whittemore: That is right.

"Mr. Talent: If we do not have the signatures or if we question the signatures, then we can raise the question later so these are sort of admitted de bene until such future time as we can raise it.

"Trial Examiner Whittemore: That is right, and if no question is raised, they are received for all purposes.

"Mr. Trent: May I proceed?

"Trial Examiner Whittemore: Yes.

"Q. (By Mr. Trent) Now, Mr. Damon—

"Trial Examiner Whittemore: (Interrupting) You wish first to offer the—do you wish to offer 5–A, B and C, which are identified as having been received through the mail?

"Mr. Trent: Yes, sir. It is my understanding that three has been offered in evidence, except F, I, L and Q, and four was not received.

"Trial Examiner Whittemore: Four has not been offered but identified.

"Mr. Trent: That is right, and five has been offered, except 5–D. That is my understanding.

"Trial Examiner Whittemore: Do you want to check to see if those three names appear on the payroll? It is my understanding, Mr. Talent, that you have, during the recess, examined the payroll and found at least the names similar to those that have been identified by this witness appear on the payroll?

"Mr. Talent: That is correct.

"Trial Examiner Whittemore: You are not raising any question that the names don't appear on the payroll?

"Mr. Talent: That is correct."
\* \* \* \* \* \*
"Mr. Talent: Excuse me. I object to the admission in evidence of General Counsel's Exhibit 5–A through 5–C.

"Trial Examiner Whittemore: The three cards are received subject to later check as to signature.

"You don't raise a question as to whether the names are on the payroll?

"Mr. Talent: No, I did not raise the objection as to the question of the names being on the payroll.

"(The documents heretofore marked General Counsel's Exhibits Nos. 5–A through 5–C for identification, were received in evidence.)"

█ From the above quotations, it would seem clear that the focal point in identification of the cards was the verity of the signature thereon; and that they were admitted subject to later comparison of signatures on the company records by counsel for Respondent, with reservation of the ruling of the Examiner "if it appears later that the signatures don't agree." No company records of signatures was ever offered nor did counsel for Respondent ever contend that Respondent had no such records nor was there any contention that there was any difference in such signatures. Obviously, such comparison of signatures would have been an effective method of proof. It is unreasonable to believe that Respondent did not have payrolls, vouchers, cancelled pay checks or some other usual method of evidencing employment and payment of wages. This evidence was in possession of Respondents; and there is a clear intimation that counsel for Respondent would examine the company records and bring to the attention of the Examiner any signatures he deemed questionable and that thereupon they would be considered.

The Act, as amended, Sec. 10(b), 29 U.S.C.A. § 160(b), requires the Board to follow the rules of evidence applicable in the District Courts "so far as practicable." We think the Examiner and the Board did so in this matter. Considering the entire evidence, we think it sustains the order of the Board.

The request of the Board for enforcement of its order granted.