**JAS. H. MATTHEWS & CO., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 17880.**

United States Court of Appeals
Eighth Circuit.

Dec. 29, 1965.

Rehearing Denied Feb. 8, 1966.

B. S. Clark, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for petitioner.

Warren M. Davison, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel and Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., for respondent.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

This is a petition by Jas. H. Matthews & Co. to review a decision and order of the National Labor Relations Board pursuant to § 10 of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519; 29 U.S.C.A. § 151 et seq.). The Board in its answer and cross-petition seeks enforcement of its order as reported at 149 NLRB No. 18.

In the case at bar the Board agreed with the Trial Examiner that the Company violated § 8(a) (1) of the Act by means of threats, coercive interrogation, surveillance and the maintenance of an unlawful, no-solicitation rule, all of which interfered with, restrained and coerced appellant's employees in the exercise of their rights under § 7 of the Act. The Board also found that the Company violated § 8(a) (5) and (1) of the Act by refusing to bargain with a Union designated by a majority of its employees. This Court has jurisdiction of the alleged unfair labor practices since they occurred at Searcy, Arkansas, within this Circuit.

434

Petitioner is a Pennsylvania corporation, with one of its three plants, the Bronze Division, located in Searcy, Arkansas. This plant specializes in the manufacture of bronze memorial tablets and plaques. The General Superintendent of the Bronz Division is Roy Randles, who is stationed in Pittsburgh, Pennsylvania. Immediately under him in authority is William Morton, Plant Superintendent at the Searcy Plant. This plant is divided into factory and foundry divisions. Morton supervises the operation of the foundry section which has thirty-five employees, while his assistant, James Landis, supervises work in the factory which employs thirty-seven others. The factory is further subdivided into four departments: (1) pattern setup; (2) tooling; (3) coloring; and (4) shipping. These departments have twelve, eleven, six and five employees, respectively. Finally, each department is headed by an individual designated a "leadman" by the Company.

The instant litigation arises out of the efforts of the International Association of Machinists, A.F.L.-C.I.O., to organize petitioner's employees, beginning in January, 1964. The Trial Examiner found that during the ensuing period of organizational activity, petitioner, through Division Superintendent Randles, Plant Superintendent Morton, Office Manager Russell, and Leadman Harmon, talked to many Company employees concerning their interest in the Union. It was determined by the Trial Examiner and the Board that these conversations "in full effect constitute interference at least, and real intent to coerce and intimidate employees (of appellant) in their concerted activities for the purpose of collective bargaining."

The primary issue presented by the instant appeal is whether or not petitioner violated § 8(a) (5) and (1) of the Act by refusing to bargain with the Union when recognition was first sought, after it claimed majority status on January 11, 1964.

The first question to which we turn is whether or not factory "leadmen" are supervisors within the meaning of § 2(11) of the Act. This must first be determined in order to find the proper place of those employees, either in or out of the bargaining unit here considered. A determination of that question will also control whether certain of the alleged § 8(a) (1) violations attributable to one or more leadmen are binding on petitioner. Next, we shall examine the merits of petitioner's contention that "(t)here is no substantial evidence to support a finding that the Union had a majority status as of January 11, 1964." Finally, we shall discuss the nature and effect of petitioner's refusal to recognize the Union on the last-above-mentioned date.

■ Section 2(11) of the Act defines a "supervisor" as:

"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

It is well settled law that "(t)his section is to be interpreted in the disjunctive, * * * and the possession of any one of the authorities listed in § 2(11) places the employee invested with (such) authority in the supervisory class." Ohio Power Co. v. N. L. R. B., 176 F.2d 385, 387, 11 A.L.R.2d 243 (6 Cir.), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. Moreover, § 2(11) "does not require the exercise of the power described for all or any definite part of the employee's time. It is the existence of the power which determines the classification." Id., at 388. Accord, N. L. R. B. v. Edward G. Budd Mfg. Co., 169 F.2d 571, 575, 576, 579 (6 Cir.), cert. denied, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441; N. L. R. B. v. Leland-Gifford Co., 200 F.2d 620, 626 (1 Cir.). However, "(i)t is not

alone that (the employee) may hire or fire or lay off or discipline. He must do so in the interest of the employer. * * * (T)here must be a determination of status based upon the 'nature' of the supervisory position and 'how completely the responsibilities of the particular position identify the holder of the position with management,' all 'because of the infinite possible variations in responsibilities enumerated in § 2(11)' * * *." International Union of United Brewery etc. Workers v. N. L. R. B., 111 U.S.App.D.C. 383, 298 F.2d 297, 303, cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (quoting from Local 636, Plumbers v. N. L. R. B., 109 U.S.App. D.C. 315, 287 F.2d 354, 362. And where, as here, "the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. * * * (T)he Board's determination * * * is to be accepted, if it has 'warrant in the record' and a reasonable basis in law." N. L. R. B. v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170; accord N. L. R. B. v. Lee-Rowan Company, 316 F.2d 209, 212 (8 Cir.), cert. denied, 375 U.S. 827, 84 S.Ct. 70, 11 L.Ed.2d 59.

On the basis of our analysis of the record, we are of the opinion that the Board's determination that such leadmen are in fact supervisors has both the necessary warrant in the record and a reasonable basis in law. Of controlling importance is the testimony that the leadmen assign work to the employees in their departments; transfer employees from job to job, as necessary in their sole opinion; pass on employee requests for time off; effectively recommend discipline; and oversee the other employees' work, as well as checking its quality. N. L. R. B. v. Syracuse Stamping Co., 208 F.2d 77, 79 (2 Cir.); Eastern Greyhound Lines v. N. L. R. B., 337 F.2d 84 (6 Cir.); N. L. R. B. v. Southern Bleachery & Print Works, 257 F.2d 235, 239 (4 Cir.), cert. denied, 359 U.S. 911, 79

S.Ct. 588, 3 L.Ed.2d 575. In addition, the record discloses that the leadmen meet regularly with Factory Foreman Landis, occasionally with Plant Superintendent Morton, and on one occasion all four leadmen attended a training session in Pittsburgh, the Company Headquarters. Of further significance in this connection is the testimony that the leadmen are paid from eleven to forty cents an hour more than the regular employees in their departments, and that petitioner's officials represented that the leadmen were their supervisors and the regular employees so regarded them. N. L. R. B. v. Schill Steel Products, Inc., 340 F.2d 568, 571–572 (5 Cir.). Finally to be noted is the fact that if the leadmen were not supervisors, Factory Foreman Landis would have to exercise detailed supervision over some thirty-seven employees in the departments involved in a variety of tasks and handling products at many stages of completion in the production process. The unlikelihood of that situation occurring was properly considered by the Board. Vega et al. v. N. L. R. B., 341 F.2d 576, 577 (1 Cir.); N. L. R. B. v. Supreme Dyeing & Finishing Corp., 340 F.2d 493, 494 (1 Cir.); N. L. R. B. v. Mt. Clemens Metal Products Co., 287 F.2d 790, 791 (6 Cir.), enforced as modified, 126 NLRB 1297, 1298, n. 4.

In short, the record here clearly supports a finding that the four leadmen are clothed "with genuine power to perform a supervisory function" (N. L. R. B. v. Leland-Gifford, supra) and the Board properly classified them as supervisors within the meaning of § 2(11) of the Act. Thus we hold that the Board correctly excluded leadmen from the bargaining unit and that petitioner is responsible for their conduct in connection with the found § 8(a) (1) violations to be discussed infra. N. L. R. B. v. Schill Steel Products, Inc., supra.

As a consequence of the above determination, the number of employees eligible for the bargaining unit is reduced from seventy-two to sixty-eight. The Union thus needed only thirty-five signed

authorization cards to comprise a majority.

The Union began the organizing campaign in question in January, 1963. In connection therewith, a meeting was held at a truck stop on January 6th, which was attended by twenty-five employees. A second meeting was held on the afternoon of January 10th. The next day, January 11th, the Union made its initial claim of majority and a bargaining demand. By that date, thirty-eight of petitioner's seventy-two employees had signed cards. On January 14th, petitioner replied by letter that it would bargain with the Union only if it were certified pursuant to a Board election. On February 3rd, the Union reiterated that it was "ready and willing to prove majority status" and that it requested recognition and bargaining. Once more, however, the Company replied that it would not bargain unless the Union was certified by the Board, and further asserted that it had a "reasonable doubt" of the Union's majority. No bargaining has taken place. It was against this background that the presently disputed Board finding was made "that Respondent violated Section 8(a) (5) and (1) of the Act in refusing to recognize and bargain with the Union as the representative of a majority of its employees"—to which issue we now turn.

█ Section 8(a) (5) of the Act requires an employer "to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a)." The latter section provides that "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all employees in such unit for the purposes of collective bargaining * * *." Although § 9(c) (1) provides machinery by which the question of representative status may be determined in a Board-conducted election, it is well-settled that an election is not the exclusive instrumentality by which a Union's representative status may be established. See

United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 71–72, 76 S.Ct. 559, 100 L.Ed. 941. Consequently, there is no absolute right vested in an employer to demand an election. N. L. R. B. v. Decker, 296 F.2d 338, 341 (8 Cir.); N. L. R. B. v. Trimfit of California, Inc., 211 F.2d 206, 209 (9 Cir.). Rather, it is established that when a Union has obtained authorization cards signed by a majority of the employees in an appropriate unit, designating the Union as their bargaining representative, an employer violates § 8(a) (5) of the Act if, absent a good faith doubt of the Union's majority status, he refuses to recognize and bargain with the Union.

In the instant case, as note *ante*, the record shows that the Union had obtained authorization cards from thirty-eight employees by January 11th, the date it requested recognition. The Board refused to count one of these cards because the employee who signed it (White) was unable to read, and executed the card because the Union adherents soliciting him to do so represented to him that the Union card would only be used to obtain an election. It is petitioner's position that at least three other cards signed by employees also ought not to have been counted "since their intention was clearly indicated that they did not authorize the Union to represent them and were misled into signing the cards." The three cards thus challenged are those signed by employees Cullum, Cook and Waller.

This issue was the subject of extensive testimony before the Trial Examiner. He concluded that the authorization cards signed by such employees allegedly under a misapprehension as to their purpose, i. e. that they were to be used solely to bring the Union issue to a vote, should be counted in the determination as to the Union's majority status. It is our opinion that this conclusion is required by the facts and the law.

The authorization cards in issue are clear on their face. They recite that the named employee authorizes the Union to represent him for the purposes of col-

lective bargaining and to negotiate in his behalf regarding wages, hours and other terms and conditions of employment. At the January 6th meeting, *ante,* at which most of the cards were signed, there is testimony in the record that Union representative Harris read an authorization card aloud and explained that if a majority of the employees signed such cards, the Union had the option of demanding recognition on the basis of the cards or of seeking an election. Such testimony was disputed, as was most of the factual testimony herein, but the Trial Examiner determined this issue of credibility in favor of the Union's witnesses, including Harris, and we are, of course, bound by that determination. We shall return to this credibility question infra.

■ Employee Cullum, whose card is presently challenged, attended the January 6th meeting and heard Union representative Harris' speech, *ante.* Afterwards, he filled out an authorization card and signed it. He then crossed out his signature because he was "undecided" and "confused". Thereafter, as he testified at the hearing, he printed his name on the card—the card contains spaces for both a signature and a printed name —and he placed the card on the table where the other employees were putting their signed cards. The card was then signed by employee Underwood, as a witness. Despite Cullum's reservation expressed at the hearing, *ante,* we feel the Board properly concluded that his authorization card was valid. "It has been held that an employee's thoughts (or afterthoughts) as to why he signed a union card, and what he thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent." Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S. App.D.C. 360, 185 F.2d 732, 743, cert. denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (and cases cited therein). In the instant case, after crossing out his signature, Cullum clearly manifested his intent to designate the Union as his bargaining representative by printing his

name on the card and turning it in to the Union. As the authorization card was perfectly clear and unambiguous, Cullum's unexpressed reservations, if indeed he had any, cannot serve to invalidate the otherwise valid designation of the Union as his bargaining representative. Cumberland Shoe Corp., 144 NLRB 1268; Winn-Dixie, Inc., 143 NLRB, No. 89. Petitioner's reliance on Fort Smith Broadcasting Co. v. N. L. R. B., 341 F.2d 874 (8 Cir., 1965) is misplaced. In that case, an employee's defection from the Union, which he communicated to a member of Management, was held to have effectively negated his earlier authorization of the Union and warranted the Company's rejection of the Union's bargaining demand on the basis of a good-faith doubt of majority status. In the instant case, however, there is no showing that Cullum, assuming he had reservations about his designation of the Union, ever communicated those reservations to anyone, a member of Management, or otherwise. In light of the foregoing, we hold that Cullum's authorization card was correctly held to be valid by the Board.

■■ The second card challenged by petitioner was signed by employee Cook. Cook signed his authorization card on January 7th, after being solicited by fellow employee Gayler who, according to Cook's testimony, told him that "the purpose of the card, to begin with, was to get the union in for a vote only." Petitioner seeks to exclude Cook's card on two grounds: that he was misled by Gayler as to the reason for signing the card; and because he "effectively cancelled his authorization card." Petitioner's contention that employee Gayler told Cook that the card would be used only to obtain an election, is wholly without merit for the elementary reason that there is no showing here that Gayler was an agent of the Union or that he was entitled to bind it in any way. See, e. g., N. L. R. B. v. Local 239, International Brotherhood of Teamsters, etc., 340 F.2d 1020, 1022 (2 Cir.). More importantly, as in the case of Cullum, *ante,* since the

438

authorization card is clear and unambiguous on its face and recites expressly that the signer authorizes the Union to represent him for the purposes of collective bargaining, Cook's signed card must likewise be viewed as binding and valid for the purpose of determining majority status on January 11th. Thus, the Board's conclusion is correct—that "(t)he very act of signing an authorization card by an employee, absent real proof of fraud or deceit, calls for a finding that the employee knew what he was doing." It is petitioner's contention that the circumstances surrounding the signing of the authorization cards should have been determined by the testimony of its witnesses, rather than those of the Union. As noted earlier, there was a good deal of conflict in the testimony. This Court has long recognized, however, that resolutions of credibility are matters for determination by the trier of fact. N. L. R. B. v. Morrison Cafeteria Co., 311 F.2d 534, 538 (8 Cir.) and cases therein cited; N. L. R. B. v. Byrds Mfg. Corp., 324 F.2d 329, 332 (8 Cir.). Thus it is not our province to say that the testimony of the witnesses adduced by General Counsel is less credible, less responsible, and weaker than that of respondent's witnesses, as respondent urges. Since the Trial Examiner had an opportunity to observe the witnesses appearing before him who testified concerning matters which were wholly factual and based upon contradictory testimony, we are bound by his credibility resolutions in this case.

■ It is also asserted that Cook "effectively withdrew" from the Union. This is based upon Cook's testimony that after signing an authorization card on January 7th, he attended the January 10th Union meeting, and a day or two later wrote a letter to the Union requesting his card back. This letter allegedly was neither written, dated, nor addressed by Cook, but was merely left with an undisclosed individual. Thereafter, the letter was received by Union representative Harris on January 23rd, enclosed in an envelope addressed to Har-

ris and postmarked January 22nd. In the light of the foregoing, we are unable to see how this "letter of withdrawal" can possibly be relevant to the question of the Union's majority status on January 11th, the date the Union requested recognition, as a principal's revocation of his agent's authority is ineffective until communicated to the agent. Restatement (2d) Agency, § 119(c), 1958; Tinley Park Dairy Co., 142 NLRB 683, 685–686. Cf. N. L. R. B. v. Hunter Engineering Co., 215 F.2d 916, 920 (8 Cir.).

The third authorization card which petitioner would have us declare invalid was signed by employee Waller. Waller, like Cook, testified that the employee who solicited him to sign his card (here, employee Simpson) told him that the card would be utilized "so they could bring it (the question of the Union) to a vote." It is clear that Waller's card was also properly counted in determining the Union's majority status on January 11th, for the reasons set forth regarding the validity of Cook's authorization, ante.

In light of the foregoing, the Trial Examiner and Board found that "the majority of the employees within the accepted bargaining unit had authorized the Union, as of the demand date of January 11, to represent them." This finding is clearly correct.

■ Notwithstanding the above, petitioner contends that "(t)here is no substantial evidence to support a finding that petitioner did not have reasonable cause to doubt the Union's claimed majority status as of January 11, 1964, and was guilty of bad faith in refusing to recognize the union." The question thus presented is whether petitioner's refusal to bargain was permissible under the Act. "It has been held that an employer may refuse recognition to a union when motivated by a good faith doubt as to that union's majority status." Joy Silk Mills v. N. L. R. B., supra, 185 F.2d at 741, citing North Electric Mfg. Co. v. N. L. R. B. (6 Cir.) 123 F.2d 887; N. L. R. B. v. Chicago Apparatus Co., (7 Cir.) 116 F.2d 753. "When, however, such

refusal is due to a desire to gain time and to take action to dissipate the union's majority, the refusal is no longer justifiable and constitutes a violation of the duty to bargain set forth in section 8(a) (5) of the Act." Joy Silk Mills v. N. L. R. B., supra, 185 F.2d at 741, citing N. L. R. B. v. Federbush Co., Inc., (2 Cir.) 121 F.2d 954, 956; N. L. R. B. v. Remington Rand, Inc., (2 Cir.) 94 F.2d 862, 868–869.

■ We think there was substantial evidence from which the Board could reasonably conclude that the original refusal of recognition was in bad faith. Cf. N. L. R. B. v. Consolidated Machine Tool Corp., (2 Cir.) 163 F.2d 376, cert. denied 332 U.S. 824, 68 S.Ct. 164, 92 L.Ed. 399. It is clear that the Union was at all times here relevant ready and willing to demonstrate its majority status to petitioner. Of decisive bearing in this regard is the Union's initial letter to petitioner, dated January 11th, the import of which was clearly to the effect: (1) that the Company's employees had requested it to represent them for the purpose of collective bargaining; (2) that a meeting for that purpose was requested; and (3) that the Union was prepared to prove its majority status. "Where, as in this case, the union had proof of its majority status readily available and (petitioner) chose not to learn the facts, it 'took the chance of what they might be.'" N. L. R. B. v. Elliot-Williams Co., Inc., 345 F.2d 460 (7 Cir.) decided April 17, 1965, citing N. L. R. B. v. Remington-Rand, Inc., 94 F.2d 862, 869 (2 Cir.), cert. denied 304 U.S. 576, 585, 58 S.Ct. 1046, 82 L.Ed. 1540; N. L. R. B. v. Dahlstrom Metallic Door Co., 112 F.2d 756 (2 Cir.).

■ Even more clearly illustrative of petitioner's lack of good faith in the case at bar is its conduct designed to suppress the Union in connection with petitioner's found § 8(a) (1) violations, *ante*. These consist of threats, coercive interrogation and surveillance of employees both before and after January 11th, the date recognition was sought. Cf. N. L. R. B. v. Wheeling Pipe Line, Inc., 229 F.2d 391 (8 Cir.); Joy Silk Mills v. N. L. R. B., supra. In connection with these found § 8(a) (1) violations, petitioner's present contention is that the record does not indicate that it created an atmosphere of opposition to the Union's organizational activities, and that the General Counsel has failed to sustain the burden of proof in this regard. Thus the issue here is whether there is substantial evidence in the record as a whole which supports the Board's findings of § 8(a) (1) violations. There is evidence in the record before us that petitioner, through its responsible agents, threatened employees with economic reprisals, withdrawal of normal promotions and raises, discontinuance of a group insurance plan, discontinuance of a profit-sharing plan, and cancellation of proposed plant expansion, if they became members of the Union; surveillance of a meeting place and Union activities of its employees; that petitioner solicited employees to withdraw from the Union; and since August 1, 1963, the Company has maintained in effect a rule prohibiting employees from soliciting on Company property without permission.

In this connection, there is testimony in the record that on the morning of January 7th, the day after the first Union meeting *ante*, department head Larry Harmon approached employee T. J. Underwood while the latter was at work, and asked, "(H)ow did the meeting go last night?" Underwood replied, "(F)ine." To this, Harmon retorted, "(Y)ou had better drop this, drop it or it will mess you up in your department." Shortly thereafter, on the same day, Harmon again approached Underwood, and this time asked him, "T. J., who is pushing the union?" Underwood replied, "I am, Larry." To this, Harmon then replied, "(I)f you don't drop it, it is going to mess you up in your department and you won't have no more promotions or raises, we won't have no more promotions or raises for you." Two days later, Harmon again talked to Underwood, and this time told him, "T. J., if a man in my department goes union, I'll make it

awfully rough on him." That same day, Office Manager James Russell was assisting Underwood in cancelling his Company Pension Plan when he said, "T. J., I hope you know what you are doing." Underwood replied, "I think I do, Rusty," to which Russell replied, "Well, I guess you know, as of Monday morning (the day of the Union meeting), this Plant has ceased to grow." At this point, Harmon entered the conversation and added, "Yes, and not only that, but you will lose all of your insurance, profit-sharing, and all of your company benefits." No extended discussion is needed to establish that these and similar statements were plainly coercive and thus violations of the Act. Bituminous Material & Supply Co. v. N. L. R. B., 281 F.2d 365, 369 (8 Cir.); N. L. R. B. v. M. J. McCarthy Motor Sales Co., 309 F.2d 732, 734 (7 Cir.). Similarly, it is clear that Plant Superintendent Morton's statement to employee Stephenson, that "fooling with the union" was going to cause him to lose his Company insurance, was also violative of the Act. See N. L. R. B. v. American Pearl Button Co., 149 F.2d 311, 315 (8 Cir.). We view in a like manner the testimony that Bronze Division Head, Randles, told Underwood that he had intended to move a vase machine to the Searcy Plant, but that since "all of this trouble has come up" he had changed his mind because he "didn't want to get all his eggs in one basket." In this connection, Harmon stated, "If we get a union in here, we won't get this vase department put in our plant."

In addition to the above, the Trial Examiner and Board also found that petitioner had violated § 8(a) (1) of the Act by means of unlawful surveillance and the maintenance of an unlawful "no solicitation rule."

In regard to employee surveillance, there is testimony in the record that Plant Superintendent Morton, Factory Foreman Landis, and Office Manager Russell were present at a truck stop where the second Union meeting took place on the afternoon of January 10th, *ante*. The meeting was held in a back room at the truck stop, and the named Company representatives were present in the main dining room. At the conclusion of the meeting, Morton and Russell had not left the diner and there is testimony by seven employees there present that Russell had a list of the Company's employees fastened to a clipboard and was seen by the employees to be checking off the names of those employees leaving the meeting. With respect to this incident, petitioner would argue the question of credibility and we need only refer to our earlier comments on this question, *ante*.

A third type of § 8(a) (1) violation found by the Board in the case at bar was the maintenance of a no solicitation rule by the Company. This finding was based upon evidence that upon being hired, each of petitioner's employees received an "Employee Handbook" from the Company. Included in the handbook is the statement, "Violation of any of the following rules of employee conduct is cause for prompt dismissal or other disciplinary action." The fifteenth rule thus listed forbids "soliciting on Company property without permission." The meaning given this rule by the Company was admitted by Division Superintendent Randles to require permission before tolerating any solicitation on Company property, even during non-working time. The Trial Examiner's conclusion, adopted by the Board, was that "such rule (as it is enforced) is in violation of Sec. 8(a) (1)." "A non-solicitation rule is unlawful if applied to non-working time as well as to working time. J. R. Simplot Company Food Processing Division, 137 NLRB 1552, 1553; Remington Rand Corporation, 141 NLRB 1052, 1056." We feel the correctness of such determination is beyond question. Republic Aviation Co. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; N. L. R. B. v. United Aircraft Corp., 324 F.2d 128, 129 (2 Cir.), cert. denied, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971.

Notwithstanding the above, petitioner relies upon Sinko Mfg. & Tool

Co., 149 NLRB, No. 21, for the proposition that "an uninforced no-solicitation rule does not violate the Act," and that the record in the instant case "shows conclusively that the no-solicitation rule has never been enforced or maintained with respect to employees' solicitation during their own time." In regard to this contention, we point out, first, that it is well established that "(w)hether (an employer) infringed upon its employees' freedom to engage in union or concerted activity * * * depends upon the reasonably foreseeable effects of its conduct upon its employees." N. L. R. B. v. Walton Manufacturing Co., 289 F.2d 177, 180 (5 Cir.). As the no solicitation rule involved herein, on its face would ban perfectly legal Union solicitation on non-working time, and as the Company never gave notice of any rescission of the rule (see Time-O-Matic, Inc. v. N. L. R. B., 264 F.2d 96, 101 (7 Cir.) or a purpose not to so interpret it, an employee desiring to engage in Union solicitation "might well be deterred, or else reasonably assume that he acted at his peril." N. L. R. B. v. Walton Manufacturing Co., supra. As aptly stated by the Second Circuit in holding a similar rule unlawful because of its breadth (N. L. R. B. v. Miller, 341 F.2d 870, 871, 874):

> "The true meaning of the rule might be the subject of grammatical controversy. However, the employees of respondent are not grammarians. The rule is at best ambiguous and the risk of ambiguity must be held against the promulgator of the rule rather than against the employees who are supposed to abide by it."

Petitioner's reliance on Sinko Mfg. & Tool Co., supra, is misplaced. Sinko involved, in relevant part, a rule prohibiting solicitation which was found to have been posted by the employer to aid one of two competing unions. In so finding, the Board noted that while the no solicitation rule was too broad, the complaint did not allege such undue broadness to be itself violative of the Act. In these circumstances, the Board did not make an un-fair labor practice finding on the basis of the rule, itself, but it noted in passing that the rule was too broad and "advised" the employer to clarify its rule to "make it obvious to employees that solicitation is prohibited only on company time and in work areas of the plant." (149 NLRB, No. 21.)

In light of the foregoing, the rulings and order of the Board are in all respects entitled to enforcement. A decree will be entered so ordering.