**FURR'S, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 8686.**

United States Court of Appeals Tenth Circuit.

Feb. 20, 1967.

Rehearing Denied March 24, 1967.

Certiorari Denied Oct. 9, 1967.

See 88 S.Ct. 70.

See also 10 Cir., 350 F.2d 84.

James H. Milam, Lubbock, Tex., for petitioner.

Anthony J. Obadal, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost and Elliott Moore, Washington, D. C., on brief), for respondent.

Before MURRAH, Chief Judge, and ALDRICH * and SETH, Circuit Judges.

MURRAH, Chief Judge.

In this unfair labor practice proceedings the Board found the employer guilty of conduct violative of § 8(a) (1) of the Act, and of refusal to bargain in violation of § 8(a) (5). The employer was ordered to cease and desist from the 8(a) (1) conduct and from refusing to bargain; affirmatively it was ordered to bargain upon request and to post appropriate notices. On petition for review and cross-petition for enforcement the dispositive issues are (1) whether the employer was responsible for the 8(a) (1) conduct, (2) whether the union timely attained majority status, (3) whether the employer entertained a good faith doubt of such majority status, and (4) whether in all events an election must be held prior to collective bargaining. We enforce the order.

The petitioning employer, Furr's, Inc., operates an interstate chain of retail supermakets. Its Las Cruces, New Mexico, store was the subject of a union[1] organization drive in the autumn of 1964. This store is under the direct control of a store manager and the general management of the home office. It has 49 nonsupervisory employees in four departments (grocery, meat, produce and drug). By October 8 a total of 28 employees had executed union authorization cards, and on that date the union notified the employer that it represented a majority of store employees and requested recognition as their bargaining agent.[2] It was found and it is not disputed that although no unit was specifically defined in the bargaining demand, the clear implication was that the union sought a storewide unit (including meat department personnel).[3] In its demand the union offered to demonstrate its majority status by means of a card check, but the offer was neither accepted nor rejected. On that same day, after the bargaining demand was made, four more employees signed union cards. Thereafter several communications passed between union and employer representatives; these were inconclusive, although an employer desire for an election was indicated. In any event recognition was not extended, and on October 12 Furr's filed a representation petition seeking an election among employees in a unit which excluded meat department personnel. This, the trial examiner found, signaled the rejection of the October 8 bargaining demand. The union subsequently filed unfair labor practice charges, and on December 15, the Board issued a complaint against Furr's. The following day the Regional Director dismissed Furr's representation petition, and the Board upheld that dismissal. A petition for review of the Board's action was dismissed by this court in Furr's, Inc. v. N. L. R. B., 10 Cir., 350 F.2d 84.

We consider first the § 8(a) (1) finding, for as we shall see infra, it is crucial to the consideration of the § 8(a) (5) findings. The trial examiner found that during the month of October, both before and after the October 8 bargaining demand, assistant store manager Amador

---

* By special designation.

1. Retail Clerks International Association, Local No. 462, AFL-CIO.

2. At contract negotiations held on October 6 concerning another Furr's store, a union official informed a Furr's representative that the union also represented a majority of the Las Cruces employees. However, there apparently was no formal bargaining demand at this time.

3. The trial examiner also found, and it is not disputed, that the bargaining demand was validly made and that a store-wide unit is an appropriate unit.

and meat department head Harrison engaged in the following activities: Amador attended a union meeting, interrogated employees concerning union activities, and threatened reprisals should the union be recognized; Harrison also threatened reprisals, and for the first time began recording employee mistakes ostensibly as justification for future disciplinary action. The examiner further found that this extensive conduct[4] occurred largely on store property during working hours, that Amador and Harrison were "supervisors" within the meaning of § 2(11) of the Act, and that Furr's was responsible for their conduct. Furr's does not dispute that Amador and Harrison committed the acts found or that those acts are the type violative of § 8(a)(1). Instead it asserts nonliability on the theory that it should not be held responsible for their conduct. In this connection we first examine the finding that Amador, Harrison and a third employee, produce department head Morgan, are supervisors.[5]

 Section 2(11)[6] is to be read in the disjunctive, and supervisory status is determined by the existence of any of the statutory powers in the employee and not the frequency of exercise. See Jas. H. Matthews and Co. v. N.L.R.B., 8 Cir., 354 F.2d 432, 434 and cases cited. But, the power must be exercised in the interest of the employer, Id. 435. Finally, since the determination involves the specific application of a broad statutory term by the agency administering the statute, the Board's finding will be accorded appropriate weight, Id. 435; the Board "must be permitted 'a large

measure of informed discretion'". N.L.R.B. v. Elliott-Williams Co., 7 Cir., 345 F.2d 460, 463, citing and quoting from N.L.R.B. v. Swift and Co., 1 Cir., 292 F.2d 561.

 Furr's relies primarily on testimony of company officials concerning the company policy that only store managers have authority to hire and fire; that while store manager Ellington received recommendations from these three employees on personnel and work schedule matters, he nevertheless exercised his independent judgment. There was employee testimony, on the other hand, to the following effect: Amador is in charge of the store when Ellington is absent, and on occasion passes on requests for "break time" and receives employee reports of absence due to illness; Harrison directs the work of the employees in the meat department, and has authority to grant time off, to hire, and to make small purchases of meat; both Amador and Harrison are regarded by the employees as their "bosses"; Morgan directs the work of employees in the produce department, and has authority to grant time off, to hire, to arrange vacation schedules, and on occasion receives reports of absence due to illness; and, while all three men do manual labor similar to that done by other employees in their departments and are paid at an hourly rate, the rate for Amador and Harrison is higher than for any other employee, and the rate for Morgan is the same as for the other highest paid employees. The examiner credited this employee testimony, and considered it sufficient to bring Amador, Harrison and Morgan within the statu-

---

4. The interrogation and threats involved some 15 different employees.

5. Supervisory status is relevant not only to the responsibility issue, but also to the majority status issue considered infra; if Amador, Harrison and Morgan are not supervisors, the number of non-supervisory employees in the unit increases to 52, and the required majority from 25 to 27.

6. "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

tory definition.[7] Finding no reason to disturb the examiner's credibility judgment, we agree that the statutory definition has been met.[8]

■ But, Furr's contends that even if Amador and Harrison were supervisors, their proscribed conduct was carried out in their individual capacities and did not bind Furr's. Ordinarily, a finding of supervisory status is sufficient to charge the employer with responsibility, see e.g. Jas. H. Matthews and Co. v. N.L.R.B., supra; N.L.R.B. v. American Manufacturing Co. of Texas, 5 Cir., 351 F.2d 74. But, this is not a necessary result, see e.g. Imco Container Co. of Harrisonburg v. N.L.R.B., 4 Cir., 346 F.2d 178. The definition of "employer" in § 2(2) of the Act includes "any person acting as an agent of an employer, directly or indirectly", and § 2(13) provides that "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." It is clear that these provisions are in complete harmony with prior decisions of the Supreme Court in International Association of Machinists, etc. v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, and H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, to the effect that employer responsibility is not to be determined according to the strict rules of agency. See N.L.R.B. v. Arkansas-Louisiana Gas Co., 8 Cir., 333 F.2d 790; Local 636, etc., Plumbing and Pipe Fit. Ind. of United States and Canada v. N.L.R.B., 109 U.S. App.D.C. 315, 287 F.2d 354; and see N.L.R.B. v. Albuquerque Phoenix Express, Nov. 16, 1966, 10 Cir., 368 F.2d 451. "We are dealing here not with private rights * * * nor with technical concepts pertinent to an employer's legal responsibility to third persons * * * but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence." International Association of Machinists, etc. v. N.L.R.B., supra, 311 U.S. 80, 61 S.Ct. 88. The test was recently stated in Irving Air Chute Co. v. N.L.R.B., 2 Cir., 350 F.2d 176, 179, "* * * [T]he employer [is responsible] for acts of a supervisor when 'employees would have just cause to believe that he was acting for and on behalf of the company'." Citing and quoting from N.L.R.B. v. Texas Independent Oil Co., 9 Cir., 232 F.2d 447. And see N.L.R.B. v. Continental Oil Co., 10 Cir., 121 F.2d 120.

■ Furr's position is that in the only instance where the activities of Amador and Harrison were called to the attention of Ellington (an employee told him that Harrison was recording employee mistakes in a black book), Ellington immediately put a stop to it; that otherwise he had no knowledge of their conduct; that Furr's policy is one of strict neutrality and non-discrimination against employees engaging in union activities; that this policy is given substance by Furr's history of amicable relations with this union at other of its stores; that the employees were well aware of this policy before the organization campaign began, and it was reiterated to them by Furr's Vice President Arnold at an employee meeting on October 14. The trial examiner rejected Furr's contention saying that the statements of Amador and Harrison "* * * were neither casual nor isolated, and they

---

7. If Amador, Harrison and Morgan are not supervisors, Ellington must supervise more than 50 employees in four departments, and when he is absent the store is unsupervised. This seems unlikely. See Vega v. N.L.R.B., 1 Cir., 341 F.2d 576, 577.

8. The Board is not estopped from considering the status of these three employees because in a previous election in 1960 at the same store the same union agreed to include the assistant manager and department heads in the bargaining unit. See N.L.R.B. v. Elliott-Williams Co., supra, where a union stipulation in a representation hearing that an employee should be included in the unit did not estop the Board from inquiring into his status and finding him a supervisor.

were made, principally, on company premises, during working hours over a considerable period of time. These coercive statements by supervisors * * * were, in the circumstances, attributable to Respondent, and, as they ran directly counter to the avowed policy of Respondent, were not expiated or expunged by Arnold's reiteration of employee freedom to organize."

We considered this very problem in two cases decided only days apart. See Utah Copper Co. v. N.L.R.B., 10 Cir., 139 F.2d 788; Boeing Airplane Co., etc. v. N.L.R.B., 10 Cir., 140 F.2d 423. In Utah Copper we felt that considering all the circumstances, the employer was responsible for the supervisor's statements, although, as here, there was much to be said for the contrary result.[9] In Boeing, on the other hand, we held the employer was not responsible under the circumstances (which included a relatively few coercive statements).

Considering the nature and extent of the conduct and the conditions under which it occurred, we hold that there is substantial support in the record for the Board's finding. It may be that Ellington did not know about the activities of Amador and Harrison, other than the latter's notebook keeping, and there is no evidence that any higher Furr's official knew about their conduct. Nevertheless, it is clear that the employees felt coerced; they repeatedly resisted Amador's efforts to learn about their union activities.

Indeed, when Vice President Arnold met with meat department employees in the presence of Harrison and asked if they had any complaints about him, none was voiced because as one employee put it, "Mr. Harrison was standing right there." Under the admonition of International Association of Machinists, etc. v. N.L.R.B., supra, we think the employees could and did justifiably conclude that the acts of Amador and Harrison reflected company policy, despite Arnold's October 14 statement which was couched in general terms and did not repudiate any of the supervisors' specific acts.[10]

Turning to the 8(a)(5) findings, it is clear that "An employer's refusal to bargain is an unfair labor practice when a union has been designated by a majority of employees in an appropriate unit, and that refusal is not made in good faith." N.L.R.B. v. George Groh and Sons, 10 Cir., 329 F.2d 265, 268. Furr's argues that the union did not in fact represent a majority of the employees on the theory that a number of cards were executed in reliance upon representations that the purpose of the card was to get an election.

The cards executed in this case were certainly unambiguous in authorizing the union to act as the employees' bargaining agent.[11] This being so, any employee misconception as to the operative effect of the card will not ordinarily invalidate it. See N.L.R.B. v. Cumberland Shoe Corp., 6 Cir., 351 F.2d

9. See Judge Phillips' dissent, pointing out that the statements were made in violation of positive instructions to refrain from such conduct, that these instructions were known by the employees, and that the employer repeatedly disavowed the supervisors' statements. Judge Phillips also points out that the policy of non-discrimination was in fact adhered to by the employer.

10. See also N.L.R.B. v. Fairmont Creamery Co., 10 Cir., 144 F.2d 128; Consumers Power Co. v. N.L.R.B., 6 Cir., 113 F.2d 38; Solvay Process Co. v. N.L.R.B., 5 Cir., 117 F.2d 83; N.L.R.B. v. Continental Oil Co., supra; Cf. N.L. R.B. v. Tennessee Coach Co., 6 Cir., 191 F.2d 546; N.L.R.B. v. Shenandoah, etc.,

10 Cir., 145 F.2d 542; N.L.R.B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680; Humble Oil and Refining Co. v. N.L.R.B., 113 F.2d 85, 93; N.L. R.B. v. J. L. Brandeis and Sons, 8 Cir., 145 F.2d 556.

11. The cards are entitled "Authorization for Representation", and in pertinent part read as follows: "Desiring to enjoy the rights and benefits of collective bargaining, I * * * hereby authorize Retail Clerks International Association, AFL-CIO, or its chartered Local Union to represent me for the purposes of collective bargaining, respecting rates of pay, wages, hours of employment, or other conditions of employment, in accordance with applicable law."

917, and cases cited; Jas. H. Matthews and Co. v. N.L.R.B., supra. However, if execution of the card is induced by representations that its sole purpose is to obtain an election, it cannot be included in computing the union's majority. See N.L.R.B. v. Cumberland Shoe Corp., supra; Jas. H. Matthews and Co. v. N.L.R.B., supra; N.L.R.B. v. Gotham Shoe Manufacturing Co., Inc., 2 Cir., 359 F.2d 684; Happach v. N.L.R.B., 7 Cir., 353 F.2d 629; N.L.R.B. v. Koehler, 7 Cir., 328 F.2d 770.[12] Applying this test, the trial examiner concluded that none of the authorization cards was tainted because executed on the basis of representations that its sole or even principal purpose was to secure an election, and that all cards introduced at the hearing, which included the four executed after the bargaining demand was made, could thus be counted to establish the union's majority.[13]

The union possessed 32 cards, and even if 7 are invalid, the union would still hold a majority of 25 valid cards. A strong case can be made for invalidity of 4 of the cards.[14] But, we need not decide the validity of these 4 cards, for there is no substantial evidence that the other cards challenged by Furr's were executed on the representation that their sole purpose was to get an election.[15]

Furr's also contends that the union's majority is invalid because acquired as the result of employee resentment arising out of the discharge of the employee Barreras. The reason for this discharge (misappropriation of company funds) was not revealed until Vice President Arnold made his speech to the employees on October 14. The argument is that until then the employees felt he had been unjustly fired, and if the facts had been known, many of the employees who signed before October 14 would never have signed. It seems sufficient to note that there is substantial evidence in the record that before the union came on the scene the employees felt Barreras was unjustly discharged and this was one reason the employees turned to the union. Unlike N.L.R.B. v. Bonnie Enterprises, Inc., 4 Cir., 341 F.2d 712, and N.L.R.B. v. Schapiro & Whitehouse, Inc., 4 Cir., 356 F.2d 675, there is nothing in the record to indicate that the union in any way instigated or inspired the sentiment, even though it may have been a motivation for pro-union sentiment. We agree with the trial examiner that the union timely attained a valid majority status.

The next argument is that even if the union timely attained a valid majority status, Furr's entertained a good faith doubt thereof and its refusal to bargain did not violate 8(a)(5). The trial examiner, relying on both Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d

12. Furr's relies on the Koehler case for the proposition that the card is invalid if induced by the representation that it will be used to get an election. However, the later Happach case makes it clear that the Seventh Circuit test set forth in Koehler is whether the card was induced by representation that its sole purpose was to obtain an election.

13. The cards received on October 8, after the bargaining demand was made, were properly counted, since at that point the proposed card check had neither been accepted nor rejected. See N.L.R.B. v. Gotham Shoe Manufacturing Co., Inc., supra, where cards executed after the bargaining demand was made but before the employer responded were included in computing the union majority. Note Judge Timbers' dissent at p. 693 of 359 F.2d. See also N.L.R.B. v. Burton-Dixie

Corp., 10 Cir., 210 F.2d 199; Local No. 152, International Brotherhood of Teamsters v. N.L.R.B., 120 U.S.App.D.C. 25, 343 F.2d 307; Scobell Chemical v. N.L.R.B., 2 Cir., 267 F.2d 922.

14. Four employees signed at a meeting at the home of employee Aaron, at which Aaron, in response to an inquiry whether signing automatically resulted in employee representation by the union, answered that there "had to be an election first." It is, however, questionable whether in making this statement Aaron was the union's agent. See J. H. Matthews and Co. v. N.L.R.B., supra, 354 F.2d p. 437.

15. There is much confusion and conflict in the record as to whether the union representatives said anything at all about an election at the various meetings.

732, and on Snow v. N.L.R.B., 9 Cir. 308 F.2d 687, found that Furr's did not in good faith doubt the union's majority, but that, as reflected by its filing of a representation petition seeking an election and by the conduct of Amador and Harrison, the refusal to bargain was "for the purpose of gaining time to undermine the union". While the Board also found an 8 (a) (5) violation, it did not rely on Snow v. N.L.R.B., supra, stating in a footnote that "The record does not establish that Respondent's filing of an RM petition on October 12, was in bad faith." The Board instead relied solely on the conduct of Amador and Harrison, and citing Joy Silk Mills v. N.L.R.B., supra, stated that their conduct " * * * made the holding of a fair election impossible and reflected a rejection of the collective bargaining principle."

Furr's asserts that the finding of bad faith is based on speculation, and that even the Board recognized this in stating that the record did not establish that the October 12 representation petition was filed in bad faith. As affirmative evidence of good faith, it points to its clear policy of neutrality in the union affairs of its employees; its amicable union relations, including voluntary recognition of this union without an election at some of its other stores; its feeling that union sentiment would evaporate with the explanation of the reason for Barreras' discharge; the fact that no specific unit was ever agreed upon; the testimony of Furr's officials that they in good faith doubted the union majority; and the continuing efforts of Furr's as evidenced by its previous petition decided 350 F.2d 84 to obtain an election in which its employees may freely express their will.

Good faith is a factual issue, and again we must look to the record to see if it contains substantial support for the Board's findings. We must say that the Board's decision on this point is confusing. If taken out of context, its finding that the representation petition was not filed in bad faith would seem to end the matter favorably to Furr's. However, as noted above, this finding was made in con-

junction with the Board's decision not to place reliance on Snow, and an understanding of that case is helpful in understanding what the Board meant. In Snow the employer agreed to a card check which was held and revealed a union majority. But, the employer still refused to bargain, insisting that an election be held. The court felt that under those circumstances, continued insistence on an election in itself manifested a lack of good faith as to the union's majority, even though it was not charged that such insistence was for the purpose of undermining the union. In that regard the Joy Silk Mills case was distinguished. The court was of the opinion that proof of a motivation to undermine the union is not essential to a finding of bad faith if lack of a reasonable doubt as to the union's majority is manifested in some other way, i.e., by insistence on an election in the face of a proven union majority. It is thus clear that the Board treated our case as a Joy Silk Mills case and not a Snow case, at least to the extent that continued insistence on an election did not in and of itself reflect bad faith.

A number of recent cases have held, following Joy Silk Mills, that 8(a)(1) conduct designed to disrupt and coerce the employees in the exercise of their statutory rights is strong evidence of a lack of good faith doubt of the existence of a union majority. See Jas. H. Matthews and Co. v. N.L.R.B., supra; N.L.R.B. v. Cumberland Shoe Corp., supra; N.L.R.B. v. Gotham Shoe Manufacturing Co., Inc., supra; N.L.R.B. v. Purity Food Stores, 1 Cir., 354 F.2d 926; Allegheny Pepsi-Cola Bottling Co. v. N.L.R.B., 3 Cir., 312 F.2d 529. And see N.L.R.B. v. J. C. Hamilton Co., 10 Cir., 220 F.2d 492. We, of course, judge the issue of good faith against Furr's history of amicable union relations, including voluntary recognition of this union at some of its other stores. Secondly, it may be that the employer thought, although erroneously, that the card majority was generated by union misrepresentation concerning the reason for the discharge of Barreras. Finally, it also seems clear

from the record that the Furr's officials responsible for rejecting the bargaining demand did not authorize the anti-union conduct of the supervisors, and it may well be they had no actual knowledge of it. But, at the same time, we have affirmed the Board's finding that the 8(a)(1) conduct represented company policy at this store, a policy of interference and coercion. In these circumstances we think the Board was justified in concluding that the company could not prevail on a claim of good faith refusal to bargain in the face of an attempt by its supervisors to undermine the union. As we have noted, case law leaves no doubt that 8(a)(1) conduct is cogent evidence of lack of good faith. And moreover, as Chief Judge Aldrich put it in N.L.R.B. v. Purity Food Stores, supra, 354 F.2d 927, "By its clearly established 8(a) 1 violations it [the employer] is barred from asserting a good faith, although erroneous, doubt * * *."

■■■ Furr's final argument is that its employees are entitled to an election as a prerequisite to collective bargaining. No case is cited in support of this proposition; instead, Furr's contends that upon filing its representation petition, an election pursuant to § 9(c) is mandatory. The court in Jas. H. Matthews and Co. v. N.L.R.B., supra, fully considered and disposed of this issue and concluded by stating that " * * * it is well-settled that an election is not the exclusive instrumentality by which a Union's representative status may be established." Id., 354 F.2d 436. And see N.L.R.B. v. J. C. Hamilton Co., 10 Cir., 220 F.2d 492; N.L.R.B. v. Albuquerque Phoenix Express, supra. And, the Board's policy of not conducting a representation election while unfair labor practice charges are pending has long met with court approval. See N.L.R.B. v. Auto Ventshade, 5 Cir., 276 F.2d 303; N.L.R.B. v. Trimfit of California, 9 Cir., 211 F.2d 206.

■ The Board here issued the bargaining order to correct both the 8(a)(5)

and 8(a)(1) [16] violations and in its brief states that an election may be held when the unfair labor practices have been remedied by a reasonable period of collective bargaining. "It is the function of the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged." N.L.R.B. v. J. C. Hamilton Co., supra, 220 F.2d 494; see also Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020.

The order shall be enforced.

16. See N.L.R.B. v. Delight Bakery, Inc., 6 Cir., 353 F.2d 344, where the court upheld a bargaining order although only violations of 8(a) (1) were involved.