KAWNEER COMPANY, a division of American Metal Climax, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor.

No. 17955.

United States Court of Appeals Sixth Circuit.

June 19, 1969.

Matthew E. Murray, Chicago, Ill., Charles J. Griffin, Jr., Chicago, Ill., Jay G. Swardenski, Peoria, Ill., Robert J. Shald, Niles, Mich., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Robert J. Shalk, Niles, Mich., on brief, for petitioner.

Alan D. Eisenberg, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Michael N. Sohn, Robert M. Lieber, Attorneys, N. L. R. B., Washington, D. C., for respondent.

Stanley Lubin, Detroit, Mich., Stephen I. Schlossberg, Detroit, Mich., Herbert L. Segal, Louisville, Ky., on brief, for intervenor.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This case is before us on a petition to review and set aside, and on a cross-petition to enforce an order of the National Labor Relations Board requiring petitioner to cease and desist from certain unfair labor practices and to bargain, upon request, with the Union.[1] The Board's Decision and Order are reported at 164 NLRB No. 138 (1967).

Petitioner, Kawneer Company, manufactures electrical applicance parts. In the spring of 1964, the Union commenced an organization drive at petitioner's plant in Cynthiana, Kentucky, where approximately 450 rank and file workers were employed. The Union used the familiar technique of attempting to secure majority status by obtaining employees' signatures on "representation" cards. The Company responded with a vigorous anti-union campaign, described by the Board in its order:

> The Trial Examiner found, and we agree, that the Respondent engaged in extensive and serious violations of Section 8(a) (1) during the course of its antiunion campaign, including interrogation of employees concerning their union sympathies and their attitudes toward unions, a grant of wage increase to an employee to induce him to vote against the Union, threats of reprisal for union activity, including loss of jobs and benefits, and coercion of employees into signifying their opposition to the Union. The Trial Examiner also found, and we agree, that Respondent violated Section 8(a) (3) by discharging employee Custer Pratt because of his activity as Union observer in the election. [Footnote omitted.]

In addition, the Board concluded, contrary to the findings of the Trial Examiner, that the Company had committed further violations of Section 8(a)(1) in a series of speeches delivered by management personnel during the course of the organization drive.

In reviewing the record as a whole we find substantial evidence to support the Board's findings that the interrogations, threats, and other coercive activities, and unilateral and unusual wage increases, were in violation of Section 8(a)(1). We also find substantial evidence to support the Board's finding that employee Pratt was discriminatorily discharged in violation of Section 8(a)(3). Accordingly, the Board's order relative to these unfair labor practices will be enforced.

The Board's order to bargain, however, presents a more difficult issue. The bargaining order was based on the Trial Examiner's finding, which the Board adopted, that the Company unlawfully refused the Union's request for recognition after a majority of the employees in the appropriate bargaining unit had designated the Union as their bargaining representative. Since we determine that the Union lacked a majority at the time it demanded recognition, we deny enforcement of the bargaining order.

---

1. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW).

During the early stages of its organization campaign the Union used a "white" authorization card, which contained the following:

## [Front]

(Union)           Authorization to UAW
(Seal)                 Date . . . . . . . . .

I, . . . . . . . . . . . . . authorize UAW to represent me in collective
     (Print Name)                         bargaining

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Address No.         Street         City         Phone No.)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Class of Work)      (Clock No.)      (Dept. No.)      (Shift)

Employed by . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
           (Company)                      (Address)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Signature of Employee)

This card is for use in support of the demand of UAW-AFL-CIO for recognition, or for an NLRB election.

(Over)

## [Back]

SECRET BALLOT ELECTION.

This card will be filed with the National Labor Relations Board to secure a secret ballot election conducted by Representatives of the United States Government.

This Card Is Confidential.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
You have the support of one of the world's largest and strongest unions . . . UAW-AFL-CIO.

Between 80 and 100 employees signed these white cards. However, on the advice of the Union's legal department, the white cards were withdrawn in the midst of the campaign and a "blue" card was substituted. The new card had the same wording on its front as the original, but the last two lines had been deleted. The back of the blue card contained the primary change and read as follows:

This Card Is Confidential.

This card may be used to secure a secret ballot election conducted by Representatives of the U. S. Government, or to prove majority representation for recognition by the employer.

Secret Ballot Election.

You have the support of one of the world's largest unions * * * UAW–AFL–CIO.

When the blue card was substituted, the Union's organizer mailed blank blue cards to most of those employees who had previously signed white cards, and he enclosed the following letter of explanation:

I would like to relate to you that our Legal Department has asked us to

make a slight change in our Authorization Card that we have been using in our Union drives. The card that you signed was *white* and the new card we are using starting now is *blue* with the slight change on the back of the card. We have just received these cards and they have suggested that we use the blue card in this drive. Therefore, I have enclosed the *blue* card for you to *sign* and return to me in the self-addressed envelope, *no postage* as you can see is *necessary*.

I regret to cause you this trouble, but all you have to do is to sign the card and send it in just as soon as possible so that we might bring about your Union as quick as possible. We will return your white card to you for you to tear up as we will have no use for it if we *receive your blue card* * * *

By no means should you fail to go ahead and sign the blue card, it's just one of the changes that is being made with the card and it happened during the signing of your cards.

* * * * * *

*Thanking you in advance for your cooperation in respect to the signing of the blue card."* (Emphasis in original).

The resolicitation was successful and many of the 80 to 100 employees who had signed white cards returned signed blue cards to the Union organizer.

Some time in June, 1964 the Union decided that it had obtained valid signatures from a majority of the employees in the bargaining unit, and on June 19 the Union first demanded recognition and offered to prove its majority by submitting the signed authorization cards to a mutually acceptable impartial party. On June 27 the Company rejected this demand and informed the Union that it doubted the claim of majority status. The Union renewed its request for recognition on June 29 and again offered to submit the signed authorization cards to an impartial party. The Company did not respond to this second request, but the Trial Examiner treated its silence as

another rejection. *See* Irving Air Chute Co., Inc. v. N. L. R. B., 350 F.2d 176, 181 (2nd Cir.1965).

On June 29, the date of the second demand, the Union also filed a petition for a representation proceeding. A Direction of Election was issued after the representation proceeding, and on September 23, 1964 the election was held. The Union lost by a vote of 196 to 189, and on September 29 unfair labor practice charges were filed.

In concluding that the Company unlawfully refused to bargain collectively with the Union, the Trial Examiner found that as of June 26 the Union had obtained 248 valid and voluntary authorization cards in a unit consisting of either 443 or 444 nonsupervisory employees. He further found that the Company's refusal to recognize the Union after this date was not motivated by a good faith doubt and therefore constituted a violation of Section 8(a)(5).

■ Among the 248 authorization cards upheld by the Trial Examiner were 11 of the "white" cards originally used by the Union. The Trial Examiner validated these white cards because they were "identical" to those "upheld by the Board as valid 'dual purpose' cards" in The Shelby Mfg. Co., 155 NLRB No. 39 (1965). However, subsequent to the Trial Examiner's decision, this court reversed the Board in Shelby and held that the card used there was ambiguous because it was "calculated to and did indicate a purpose to secure an election." N. L. R. B. v. Shelby Mfg. Co., 390 F.2d 595, 596 (6th Cir.1968). Although our decision in *Shelby* was buttressed by the observation that the card solicitors represented to a number of employees that their purpose was to secure an election, it did not turn on this additional element. Nevertheless, we observe that there is evidence in this case that many card signers were told by the Union solicitors that these cards were for an election. Thus, the 11 white cards validated by the Trial Examiner must be discounted in deciding whether the Union had obtained valid signatures from a

majority of the employees at the time it requested recognition.

■ Also among the authorization cards validated by the Trial Examiner were the approximately 80 to 100 blue cards that had been returned after receipt of the Union organizer's resolicitation letter (previously quoted). In that letter requesting the employees who had signed white cards to sign the substituted blue card, the Union organizer represented that the "change" in the card was "slight", amounting to little more than a change in color and an unimportant modification of the wording on the back of the card. In fact, however, the change converted an ambiguous authorization card[2] into an apparently valid dual purpose authorization card. Such a "change" in legal effect is more than "slight", and therefore the organizer's characterization misrepresented what had been accomplished.[3] Accordingly, signatures obtained as a result of the resolicitation letter also should not have been counted by the Trial Examiner in determining the Union's majority status.

If the approximately 80 to 100 signatures obtained on resolicitation and the 11 signatures on the white cards are excluded, the Union falls far short of the 222 or 223 valid signatures needed to establish majority status in the bargaining unit. Therefore, the Board's bargaining order based on the Union's majority status at the time the Company refused to bargain collectively was improper and cannot be enforced. *See* Schwarzenbach-Huber Co. v. N. L. R. B., 408 F.2d 236 (2nd Cir., Mar. 5, 1969).

Enforcement is granted the Board's order remedying the violations of Sections 8(a)(1) and 8(a)(3). Enforcement is denied the Board's order that petitioner bargain upon request.

EDWARDS, Circuit Judge (dissenting).

In this case Kawneer, a manufacturing company located in Cynthiana, Kentucky, asks this court to set aside a National Labor Relations Board order requiring it to cease certain practices and to bargain with a union.[1] The NLRB seeks enforcement of the same order. The parties agree only upon the legal question we have to answer, namely, whether or not there is substantial evidence to support the Board's findings of violations of sections 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (3), (5) (1964), and consequently to grant enforcement of its remedial orders.

Kawneer employed about 450 people in manufacturing electrical appliance parts. In the spring of 1964 the union began an organizational drive. The company responded with such vigor that the Board order recites:

"The Trial Examiner found, and we agree, that the Respondent engaged in extensive and serious violations of Section 8(a) (1) during the course of its antiunion campaign, including interrogation of employees concerning their union sympathies and their attitudes toward unions a grant of wage increase to an employee to induce him to vote against the Union, threats of reprisal for union activity, including loss of jobs and benefits, and coercion of employees into signifying their opposition to the Union. The Trial Examiner also found, and we agree, that Respondent violated Section 8(a) (3) by discharging employee Custer Pratt because of his activity as Union observer in the election." (Footnote omitted.)

The record contains much testimony which supports the findings of interro-

---

2. *See* N. L. R. B. v. Shelby Mfg. Co., 390 F.2d 595, 596 (6th Cir. 1968).

3. Of course, if the Union organizer's characterization of the change was accurate, it may be that the blue cards, too, were

ambiguous for the reason enunciated in *Shelby, supra.*

1. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW.

gation and coercion, unilateral and unusual wage increases during the period in question, and discriminatory discharge of employee Pratt. The plant manager and the company vice president made twelve speeches to the employees during this period. The Trial Examiner found that these speeches did not go beyond the free speech rights of the company—and the Board found that they did. Reviewing these speeches against a record which contains testimony that company foremen were openly stating that if the union came in, the company would move its plant from Cynthiana, I find ample grounds at least for the Board's inferences that the speeches contained threats of loss of jobs and the closing of the Cynthiana plant. Threats of economic reprisal which are within the capability of the company to carry out are not protected by section 8(c) of the NLRA. Surprenant Mfg. Co. v. NLRB, 341 F.2d 756 (6th Cir.1965).

Petitioner, however, reserves its heaviest fire for the finding of the Board that it violated section 8(a) (5) of the NLRA by refusing to bargain with the union and for the Board's order requiring it to do so. Resolution of these matters requires further recital of facts.

On June 19, 1964, the union sent a letter to the company claiming to represent a majority of the employees and requesting bargaining rights. In that letter the union offered to submit signed authorization cards to an impartial person for a card check. The company by letter rejected the demand for bargaining rights. The demand for bargaining rights and the offer of a card check was renewed by the union on June 29 by telegram, to which the company made no response.

The union card majority, as determined ultimately by the Trial Examiner and the Board, was 248 out of an employee bargaining unit of 444. In the NLRB election which was subsequently conducted, with challenged ballots excluded, the tally showed 189 for the union and 188 for no union. When the Regional Director ruled on the challenged ballots, the final tally showed 189 for the union and 196 for no union.

The Trial Examiner's decision (and that of the NLRB) on this complaint specifically held that the union had a valid card majority on June 29, 1964, when it last demanded bargaining and that Kawneer's refusal to bargain violated the NLRA. The decision also held the election to have been invalid and set it aside.[2]

Kawneer claims that these conclusions are erroneous in that the union never had a valid card majority and that in any event the company's refusal to bargain under all the facts was based on a good-faith doubt.

In support of its claim of a card majority, the union introduced a total of 263 cards at the NLRB hearing as opposed to 223 needed for a majority of the Kawneer bargaining unit. Of these cards the Trial Examiner found three invalid, declined to rule on twelve, and found eleven "white" cards valid and 237 "blue" cards valid for a total of 248.

The company attacks all of the "white" cards as ambiguous and asserts that they should be held invalid because of misrepresentation in the statements thereon.

2. Appellant seeks to contest this order. Procedurally, however, this cannot be done directly in a petition to review, absent certification of the union after an election and a subsequent complaint of refusal to bargain. *See* Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) ; Timken-Detroit Axle Co. v. NLRB, 197 F.2d 512 (6th Cir. 1952) ; NLRB v. Checker Cab Co., 367 F.2d 692 (6th Cir. 1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967).

The "white" cards were the ones first distributed by the union. The face of the white card contained the following:

"(Union)                       Authorization to UAW
(Seal)                          Date . . . . . . . . . . . . .

"I, . . . . . . . . . . . . . . . . . . . . . . authorize UAW to represent me in col-
         (Print Name)         lective bargaining

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   (Address No.         Street        City          Phone No.)

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Class of Work)        (Clock No.)       (Dept. No.)         (Shift)

"Employed by . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 (Company)                  (Address)

                            . . . . . . . . . . . . . . . . . . . . . . . . . .
                            (Signature of Employee)

"This card is for use in support of the demand of UAW-AFL-CIO for recognition, or for an NLRB election.

                                          (Over)"

On the back of the white cards was the following:

### "SECRET BALLOT ELECTION.

"This card will be filed with the National Labor Relations Board to secure a secret ballot election conducted by Representatives of the United States Government.

"This Card is Confidential.

"You have the support of one of the world's largest and strongest unions . . . UAW-AFL-CIO."

The blue cards were substituted in the midst of the organizing campaign on the advice of the legal department of the union. Aside from color, the only change on the front or signature side was the elimination of the last two lines of type. The reverse side of the blue card, however, was changed to read:

"This Card is Confidential.

"This card may be used to secure a secret ballot election conducted by Representatives of the U. S. Government, or to prove majority representation for recognition by the employer.

"Secret Ballot Election.

"You have the support of one of the world's largest and strongest unions . . .

UAW-AFL-CIO."

Kawneer's concern over the differences between the two cards seems to me to be exaggerated. Neither contains any misrepresentations. I believe that the changes outlined above are desirable ones—particularly since on the blue card's signature side there is reference only to authorization of union representation. But this court has upheld the Board's finding of validity for representational purposes of "dual purpose" cards containing language considerably more subject to possible misunderstanding than the white cards here involved. *See* NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965). The law itself creates the possible dual use of union membership cards. Where an employee signs a card designating a union as bargaining agent, that card can be employed to make the required showing to support a petition for an NLRB election. See 29 U.S.C. § 159(a) (1964), and regulation 29 C.F.R. § 101.17 (1968), enacted pursuant to 29 U.S.C. § 159(c) (1964). And, of course, that was done here.

Further, as to the white cards counted by the Trial Examiner, there was no claim of solicitation misrepresentation. And in any event, these eleven cards, if deducted from the total found valid, would not serve to eliminate a union card majority. *Cf.* NLRB v. Shelby Mfg. Co., 390 F.2d 595 (6th Cir. 1968); Dayco Corp. v. NLRB, 382 F.2d 577 (6th Cir. 1967).

Kawneer's other contention concerning the cards which merits discussion is its claim that 25 cards should have been held invalid by the Board because of solicitation misrepresentation.

All of these cards were blue cards where the signer placed his name on a line following absolutely unambiguous and single purpose language authorizing union collective bargaining representation. There was no testimony as to any of these cards that there was any misrepresentation that they would be employed "just" for or "only" for an election (NLRB v. Cumberland Shoe Corp.,

351 F.2d 917 (6th Cir. 1965)) or that other words were used which were "clearly calculated' to create such a belief in the mind of the signer. (*Cf.* NLRB v. Swan Super Cleaners, Inc., 384 F.2d 609, 618 (6th Cir. 1967); Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551 (6th Cir. 1967)).

The Trial Examiner made a careful analysis of these cards and the testimony pertaining to them and concluded that they "constituted valid union designations" and that there had been as to them "neither fraud nor misrepresentation nor deceit." The Board affirmed this finding and I believe there is substantial evidence to support it.

Finally, Kawneer suggests (and, surprisingly to me, my colleagues agree) that 80 to 100 otherwise valid blue cards should be invalidated because the letter soliciting them termed the change from the "white" card to the "blue" card to be "slight."

Since for the reasons stated above I find the "white" card contained no misrepresentation or fatal ambiguity, I find no error or misrepresentation in the word "slight." The distinction between the two is thin enough to bother a trained lawyer. And, contrary to the court's intimation in footnote 3, the "blue" cards are, as the Board found them to be, clear and unambiguous.

This then leaves remaining the problem of whether Kawneer's refusal to bargain was occasioned by good-faith doubt. Kawneer's reasoning on this issue and the Board's rationale in rejecting it is effectively set forth in the following paragraph of the Trial Examiner's decision:

"Between the time Orr received the Union's letter on June 19 and the date when he replied, June 27, Orr conferred with other officials of the Respondent and with counsel. He testified that his doubt of the Union's majority was based upon the Respondent's long experience in past elections in which its employees had repeatedly rejected the efforts of unions to or-

ganize them, plus the information and advice he received from other management personnel during the June 19–27 period. In connection with Orr's motive in refusing to recognize the Union without an election, the Respondent points out in its brief that it has never previously been charged with the commission of any unfair labor practices. On the other hand, the Respondent refused the Union's suggestion that a card count be made by a disinterested third party, and embarked upon a series of activities violative of Section 8(a) (1) described above. There were more than a dozen such instances, involving at least a half-dozen individual supervisors. Undoubtedly, these occasions of interference, restraint and coercion were sufficiently numerous and sufficiently serious to destroy the possibility of holding a free election. Furthermore, as will appear hereafter, the Respondent discriminatorily discharged Custer Pratt, one of the Union's most active supporters, shortly after the election. In the light of all these events I am convinced and find that the Respondent's refusal to recognize or bargain with the Union since June 29 was not based upon a good-faith doubt of the Union's majority status, but on the contrary was motivated by the Respondent's desire to gain time with which to dissipate that majority illegally. Such conduct violated Section 8(a) (1) and (5) of the Act.[61]

"61. Joy Silk Mills, Inc., 85 NLRB 1263, enfd. as modified [87 U.S.App D.C. 360] 185 F.2d 732 (C.A.D.C.), cert. denied 341 U.S. 914 [71 S.Ct. 734, 95 L.Ed. 1350]; Model Mill Company, Inc., 103 NLRB 1527, enfd. 210 F.2d 829 (C.A.6); Winn-Dixie Stores, Inc., 143 NLRB 848, enfd. 341 F.2d 750 (C.A.6); S. N. C. Manufacturing Co., Inc., 147 NLRB 809, enfd. [122 U.S. App.D.C. 145] 352 F.2d 361 (C.A.D.C.), cert. denied 382 U.S. 902 [86 S.Ct. 235, 15 L.Ed.2d 155]; Irving Air Chute Company, Inc., Marathon Division, 149 NLRB 627, enfd. 350 F.2d 176 (C.A. 2); Cumberland Shoe Corporation, 144 NLRB 1268, enfd. 351 F.2d 917 (C.A. 6); L. E. Farrell Company, Inc., 153 NLRB No. 5 [40], enfd. [360] F.2d

[205] (C.A.2), May 2, 1966; Furr's Inc., 157 NLRB No. 38 [387], [enfd. 381 F.2d 562 (C.A.10), cert. denied, 389 U.S. 840 (88 S.Ct. 70, 19 L.Ed. 2d 105)]; J. M. Machinery Corporation, 155 NLRB No. 100 [860]; and Corrosion Coating Company, et al., 157 NLRB No. 74 [806]. As the Court said in N. L. R. B. v. Primrose Super Market of Salem, Inc., 353 F.2d 675 at 676 (C.A.1), [cert. denied, 382 U.S. 830 (86 S.Ct. 68, 15 L.Ed.2d 74)], 'the Board may properly decline to consider good faith as a defense to a Section 8(a) (5) charge when the employer has exercised manifest bad faith in its other responses to the same attempt at unionization.' "

In this case the Board characterized Kawneer's violations of section 8(a) (1) of the NLRA as "extensive and serious." I believe this record contains substantial evidence to support this characterization. Further, the Trial Examiner found that the union's loss of majority "can clearly be attributed to the respondent's illegal conduct." There is substantial evidence to support this conclusion.

What has been said above places the instant case in the category of cases like NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. denied, 382 U. S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965); Furr's, Inc. v. NLRB, 381 F.2d 562 (10th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967); NLRB v. L. E. Farrell Co., Inc., 360 F. 2d 205 (2d Cir. 1966), and Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). In *Cumberland Shoe* we said:

"The underlying problem in this whole area is, of course, that of determining from the record of testimony before an NLRB Trial Examiner whether or not the employer's refusal to bargain was based upon a 'good-faith doubt,' or on the contrary, was a mere device on the part of the employer to take such steps as he could to deprive the union of employee support needed to constitute that majority. In

cases such as this, where the employer's unfair labor practices are clearly established, both before and after the demand for bargaining, the good faith of his doubts of the union majority may properly be regarded with some suspicion." NLRB v. Cumberland Shoe Corp., *supra*, 351 F.2d at 920.

In NLRB v. Ben Duthler, Inc., 395 F.2d 28 (6th Cir. 1968), where this court refused to enforce a bargaining order, the decisive distinctions bearing on a good-faith refusal to bargain were effectively set forth: ·

"Pertinent considerations are the nature of the Section 8(a) (1) violations, the percentage of employees signing authorization cards, the wording of the cards and the method of soliciting signatures, and the results of any Board election.

"The primary responsibility for evaluating the particular considerations, however, lies with the Board; and where on substantial evidence the Board concludes that a company's illegal interference with its employees' rights to organize and bargain collectively caused the loss of majority status by a union, it has discretion to fashion an effective remedy (including a bargaining order) to restore the status quo ante. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); National Labor Relations Board v. Atco-Surgical Supports, Inc., 394 F.2d 659 (6th Cir. 1968); National Labor Relations Board v. Delight Bakery, Inc., 353 F.2d 344 (6th Cir. 1965). Our problem with this bargaining order is that we do not find substantial evidence to support the conclusion that Duthler's Section 8(a) (1) violations caused the union to lose majority status.

"As indicated earlier, the Section 8(a) (1) violations committed by Duthler were not the flagrant kind. No employees were discharged; no threats were made of moving the stores or closing the stores; and no employee was repeatedly or directly threatened by the employer or supervisory personnel. The statements of the employer and supervisory personnel that were found to be violations were the borderline type of statements between legitimate comment and 'veiled threats,' where the Courts generally defer to the expertise of the Board but where the coercive effect on the employee is slight. Any lingering effect of these actions of Duthler should be completely dissipated by the usual postings required by the Board. So in a re-run election Duthler will not benefit from any past violations. Also in the Family Foods-Local 36 dispute, which concerned the same employer, the Board's findings clearly show that Mr. Duthler has not rejected the principles of collective bargaining. Therefore, the need to deter employer unfair labor practices would not justify a bargaining order in this case." *Id.* at 33–34.

I believe that what I have already recited from the factual record in this case stands in vivid contrast to the facts in *Duthler*.

The National Labor Relations Board findings of violations of sections 8(a) (1), 8(a) (3) and 8(a) (5) are supported by substantial evidence and the orders of the Board should be enforced in full.